Filed 12/20/17; Certified for Publication 1/8/18 (order attached)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| CLEWS LAND AND LIVESTOCK, LLC et al.,<br><br>    Plaintiffs and Appellants,<br><br>    v.<br><br>CITY OF SAN DIEGO,<br><br>    Defendant and Respondent,<br><br>JAN DUNNING et al.,<br><br>    Real Parties in Interest and Respondents. | D071145<br><br><br>(Super. Ct. No. 37-2015-00032905-CU-TT-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Timothy B. Taylor, Judge.  Affirmed.

Kevin K. Johnson and Jeanne L. MacKinnon for Plaintiffs and Appellants.

San Diego City Attorney's Office and Glenn T. Spitzer for Defendant and Respondent.

Schwartz Hyde & Sullivan, Kevin P. Sullivan; The Jon Corn Law Firm, Jonathan C. Corn and Arie L. Spangler for Real Parties in Interest and Respondents.

Plaintiffs Clews Land and Livestock, LLC; Barbara Clews; and Christian Clews (collectively, CLL) appeal a judgment in favor of defendant City of San Diego (City) on CLL's petition for writ of mandate and complaint for declaratory and injunctive relief, violation of procedural due process, and equitable estoppel. CLL's petition and complaint challenged the City's approval of a project to build a private secondary school on land neighboring CLL's commercial horse ranch and equestrian facility and the City's adoption of a mitigated negative declaration (MND) regarding the project. The for-profit school, the Cal Coast Academy, is being developed by real parties in interest Jan Dunning, Cal Coast Academy RE Holdings, LLC, and the North County Center for Educational Development, Inc. (collectively, Cal Coast).

CLL contends the court erred by denying its petition and resolving its remaining claims in favor of the City. It argues the City should not have adopted the MND because the Cal Coast Academy project would cause significant environmental impacts in the areas of fire hazards, traffic and transportation, noise, recreation, and historical resources, and because the MND identified new impacts and mitigation measures that were not included in the draft MND. CLL further argues the City should not have approved the project because it is situated in designated open space under the applicable community land use plan and because the City did not follow the provisions of the San Diego Municipal Code (SDMC) applicable to historical resources.

The City and Cal Coast respond that CLL did not exhaust its administrative remedies because it failed to appeal the decision adopting the MND to the San Diego City Council. On the merits, the City and Cal Coast argue the project would not cause

2

any significant environmental impacts in the areas identified by CLL, the project is not inconsistent with the open space designation, and the City complied with the historical resources provisions of the SDMC.

For reasons we will explain, we conclude CLL's challenge to the MND is barred because it did not exhaust its administrative remedies in proceedings before the City. In doing so, we reject CLL's argument that the City's process for administrative appeals—at least as implicated by this project—violates the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.)[1] by improperly splitting the adoption of an environmental document (e.g., the MND) from the project approvals. We further conclude CLL's challenge to the MND fails on its merits, even assuming CLL had exhausted its administrative remedies. Finally, we conclude the City complied with all applicable requirements of the SDMC regarding historical resources and the City's approval of the project does not conflict with the open space designation because the project will be located on already-developed land. We therefore affirm the judgment.

---

[1]     Further statutory references are to the Public Resources Code unless otherwise stated. The administrative guidelines adopted by the Secretary for Resources to implement CEQA (Cal. Code Regs., tit. 14, § 15000 et seq.) will be referred to as "Guidelines" followed by the section number. "We need not decide for purposes of this appeal whether the Guidelines are binding on the courts. At a minimum . . . the Guidelines are entitled to great weight so long as they are not clearly unauthorized or erroneous." (*California Oak Foundation v. Regents of University of California* (2010) 188 Cal.App.4th 227, 240, fn. 3.)

FACTUAL AND PROCEDURAL BACKGROUND

*The Project and Its Surroundings*

The project consists of a 5,340-square-foot school, divided into three classroom buildings under a single roof, on an approximately one-acre site. The school will have a maximum enrollment of 75 students, with 18 staff members. Along with the school, the project proposes construction of a 24-stall parking lot, landscaping, and removal of certain existing features on the site, including a concrete-filled swimming pool.

A farmhouse at the site was built around 1900 and is a designated historical resource, part of the larger Mount Carmel Ranch (Historical Resources Board No. 391). Cal Coast currently uses the farmhouse as an administrative office, and it will continue to do so following project completion. Several older outbuildings exist at the site as well. The project will not affect the farmhouse or outbuildings, and the school's design incorporates features intended to ensure compatibility with the historic nature of the site.

The site is adjacent to CLL's equestrian facility, the Clews Horse Ranch. The ranch consists of a 45-stall parking lot, corrals, stables, riding areas, a barn, a club house, and two or three single family homes. A riding ring abuts the project site. The ranch has facilities for over a hundred horses and a dozen cattle. Individuals come to the ranch to ride or participate in other equestrian activities. The ranch also holds a popular rodeo.

The project site is situated at the end of Clews Ranch Road, a 1,650-foot private driveway that also provides access to the ranch. It is approximately 20 feet wide and has a posted speed limit of 10 miles per hour. Clews Ranch Road runs east-to-west and connects with Carmel Country Road. At that intersection, a public parking lot serves

4

recreational bicycle and hiking trails in the area. Clews Ranch Road is the sole vehicular accessway for both the project site and the ranch, although a dirt road runs westward from the site and connects with Carmel Creek Road. The project site sits on a bluff above State Route 56, a busy divided highway. Across the highway is a developed suburban area.

The site lies within the "Neighborhood 8" portion of Carmel Valley, a designated community plan area within the City. Under the Carmel Valley Neighborhood 8 Precise Plan, the site is designated as open space. The site is zoned residential MF-1, which allows construction of multifamily dwellings up to a density of seven to fifteen units per acre. MF-1 zoning allows "by right" construction of primary and secondary schools. The site is also within the coastal zone. When the neighboring ranch was permitted in 2007, the City changed its zoning from multifamily residential to agricultural. The ranch is also designated open space.

*The City's Initial Study*

Cal Coast applied to the City for the approvals necessary to develop the project. In an initial study, City staff determined the project would not have a significant impact on any environmental factors, with the exception of "cultural resources," i.e., archaeological and paleontological resources. Such resources may exist in the project area. However, City staff concluded the environmental impact would be less than significant if mitigation measures were adopted, including on-site monitoring during grading activities.

5

As relevant here, the initial study also assessed the project's potential impacts on historical resources, fire hazards, land use and planning, noise, recreation, and transportation and traffic. The initial study identified the farmhouse as a historical resource, but it determined that the project's effects on the farmhouse would be less than significant because the farmhouse and outbuilding structures would be maintained and because the school's design was consistent with the City's historical resource regulations. As to fire hazards, the initial study noted the project site was adjacent to native or naturalized vegetation in the Carmel Valley River Enhancement Program (CVREP) area along State Route 56. Based on its location, the project would be subject to brush management regulations. In addition, the project's design incorporated fire resistant materials and tempered glass windows. Based on these factors, the initial study concluded that the project would not "expose people or structures to a significant risk of loss, injury or death involving wildland fires." As to land use, the initial study determined the project was compatible with the community plan and permitted by the underlying multifamily residential zoning. As to noise, it found no environmental impact. The initial study noted that the project would not be a "permanent noise generating source" and "would not expose people to a substantial increase in temporary or periodic ambient noise levels." As to recreation, the initial study concluded the project would have no impact on recreational resources. And as to traffic and transportation, the initial study likewise found no impact. It determined that the project was consistent with the community plan and underlying zoning, would not cause any permanent increase in traffic, and would not result in inadequate emergency access.

6

## The Draft MND and Public Comments

Based on the initial study, City staff prepared a draft MND for the project. The draft MND described the proposed project (albeit as "three modular buildings" rather than a single building), identified the potential impact on cultural resources, and described the mitigation measures Cal Coast would adopt to lessen any such impact. The City's initial study was attached to the draft MND.

Several interested parties submitted comments in response to the draft MND. Two Native American tribes wrote regarding cultural resources. City staff responded by pointing out the mitigation measures in the draft MND. The San Diego County Archaeological Society wrote to clarify the qualifications of any archaeological monitor. A consultant engaged by Cal Coast requested certain technical corrections, including changing the description of the project from "three modular buildings" to "a new single-story building."

CLL submitted comments criticizing the use of an MND for the project. It contended the City was required to prepare an Environmental Impact Report (EIR). Among other things, CLL argued that potential impacts on historical resources, fire hazards, noise, and transportation and traffic should be studied in an EIR. CLL believed the draft MND's treatment of historical resources was inadequate without a comprehensive survey of the project site. It further believed the draft MND did not adequately consider the hazards to students and teachers from wildfires, especially given the limited access to the project site. CLL contended the draft MND ignored the impact of noise on the Clews Horse Ranch and alleged the project "create[d] a real threat to the

7

viability of the ranch as [a] place to board and train horses." (A ranch creditor also wrote to complain that approval of the project would "impair[] the ability of Clews Ranch to realize its economic potential and therefore impairs the security of [his] loan.") Finally, CLL argued the project's use of Clews Ranch Road would overburden the easement held by the project site over the road.

A ranch client submitted comments that echoed CLL's concerns regarding noise. The individual noted the ranch's riding area was very close to the project site. He alleged construction activities at the project site had caused "loud, unanticipated noise, or blowing plastic sheets" that caused him and other riders to be thrown from their horses. He further alleged that Clews Ranch Road could not handle additional traffic and had numerous blind spots. He believed additional traffic would endanger horses and riders that use the road. As to the latter concerns, City staff responded that the dimensions, alignment, and surfacing of the road had been reviewed by City engineering, transportation, and fire personnel, who determined it was adequate to serve both the school and the ranch. City staff noted Cal Coast had proposed to use a shuttle bus service to transport students to the school from the public parking lot at the intersection of Clews Ranch Road and Carmel Country Road, thereby reducing traffic on Clews Ranch Road.

CLL engaged a fire safety consultant, Van Collingsworth, to submit additional comments regarding fire hazards related to the project. Collingsworth concluded the project had significant adverse fire safety impacts that required preparation of an EIR. He noted the project site was within a Very High Fire Hazard Severity Zone and a flood plain. Collingsworth identified a large number of questions regarding fire safety that he

8

alleged went unanswered in the draft MND. These questions revolved around topics such as the project's design and construction standards, the evacuation plan for the school, first responder response times and capabilities, and brush management guidelines. Collingsworth also provided general information regarding the vulnerability of structures and people to wildfires, the strength and intensity of expected wildfires, the impact of drought conditions on fire behavior, and the safety of firefighters and other emergency personnel. He expressed concern that Clews Ranch Road would be inadequate to evacuate the school in addition to the animals and people at the ranch. Finally, he asserted without citation that "[t]raffic is already constrained and gridlocked during commuter hours on and offsite under current conditions."

City staff reviewed Collingsworth's comments and did not believe he had raised any significant environmental impacts. The fire marshal had reviewed the project and found it complied with City fire codes. Similarly, an outside consultant engaged by Cal Coast had prepared a wildfire analysis in response to Collingsworth's comments. The consultant identified no significant impacts regarding fire safety. Cal Coast also submitted a brush management plan and a fire protection and emergency evacuation plan, which described two evacuation routes (one eastward and one westward) in the event of an emergency.

City staff identified several project design features that reduced the potential for fire hazard impacts, including fire resistant building materials, brush removal, a new water line and fire hydrant serving the project site, and an annually reviewed evacuation plan. They described the contents of the school's evacuation plan, including exit routes

9

east along Clews Ranch Road to Carmel Country Road and west along a dirt road to Carmel Creek Road. City staff noted the school intended to close on red flag warning days out of an abundance of caution. For fires that might originate at the school, City staff noted among other things that the project will incorporate interior sprinklers that successfully suppress 98 percent of fires.

Cal Coast engaged a consultant to prepare an analysis of potential noise impacts caused by the project. The consultant reported that school would be in session from 8:30 a.m. until 2:00 p.m., with morning and lunch breaks. No physical education classes would be on site, and the school would not use bells or other alarms (except for fire alarms). Given the proximity of State Route 56, approximately 200 feet from the project site, the consultant found the average ambient noise level at the site was approximately 60 decibels. The consultant identified the loudest likely noise generated by students and faculty at the school as laughter, which has a level of approximately 88 decibels. It modeled a worst-case scenario, where the laughter was continuous over a one-hour period, and the weighted average noise levels ranged between 38 and 49 decibels at the receivers in the model. Because these levels were less than the observed noise level at the site, the consultant concluded the project's noise impact would not exceed levels that would disturb sensitive wildlife under the City's noise significance determination thresholds.

*The Final MND and Public Comments*

After receiving the comments and reports described above, City staff prepared a final MND for the project. The final MND incorporated Cal Coast's requested change to

10

the project description, as well as new information from the reports and analyses prepared by Cal Coast. For example, City staff changed their conclusion regarding emergency access to the project from "no impact" to "less than significant impact" and added detail regarding the City's review of emergency access to the school. After review by the San Diego Fire Department, City staff determined the school met its emergency access requirements. This determination was supported by Cal Coast's fire consultant, who concluded that the project would not expose people or structures to a significant risk of loss, injury, or death from wildland fires. The final MND confirmed, however, that "the physical scope of the project, project impacts, proposed mitigation measures and conclusions of the [MND] are not affected by the revisions."

After City staff prepared the final MND, the Carmel Valley Community Planning Board (CVCPB) considered the project. Christian Clews is a member of the CVCPB, but he recused himself from its consideration of the project. Several board members expressed concern about the multifamily residential zoning of the project site and expressed their desire to have open space there. The project was put to a vote by the board. The vote failed, with five in favor, four opposed, and two abstentions. Nine votes were required to support the project.

The board chair subsequently wrote to the City to describe the "unusual dilemma" the project posed to the board. He wrote that the site's multifamily residential zoning seemed incompatible with the community plan, which designated the site as open space. (For this reason, the chair abstained from the vote.) The chair stated that he personally did not object to a school at the site because it appeared to be an acceptable use of the

11

protected area. But other board members expressed concern that the school's use of the site would not be compatible with the horse ranch next door. The chair believed further study of the issue was needed. Other board objections included concerns over the impact of noise and traffic on the horse ranch, the impact of the school's operation on the public parking lot that would be used by the school's shuttle buses, the impact of development on the rural setting and nearby recreational trails, the severity of fire hazards and the adequacy of evacuation routes, and the general sense that "many issues still could use more detailed and guaranteed solutions."

CLL submitted additional comments objecting to allegedly significant changes to the project and demanding recirculation of the MND. CLL also argued that the City had not complied with its historical resource regulations. Collingsworth submitted additional comments as well that criticized the project's brush management and evacuation plans. He also rebutted the City's responses to comments on the draft MND.

*Proceedings Before the Hearing Officer*

The City scheduled a public hearing on the project before a City hearing officer. In a report to the hearing officer, City staff recommended the project be approved in full, i.e., the final MND be adopted and permits for coastal development and site development be issued. The report described the current site conditions, the proposed project, and the governing community plan. It noted the site was within an area of designated open space, but it concluded that the project was consistent with the community plan's open space policies because the new development did not extend beyond previously developed

12

and disturbed areas. After hearing speakers for and against approval, the hearing officer approved the project and adopted the MND.

The public hearing notice stated, "The decision of the Hearing Officer is final unless appealed to the Planning Commission," and "The decision made by the Planning Commission is the final decision by the City." It then advised, "The adoption of [an MND] may be appealed to the City Council after all other appeal rights have been exhausted. All such appeals must be filed by 5:00 PM within ten (10) business days from the date of the Planning Commission's certification/adoption of the environmental document."

At the time of the hearing, the City published Information Bulletin 505, a guide to the City's appeal procedure under the SDMC. The City divides its procedures for approving development applications into different numbered processes. (SDMC, § 112.0501.) The City handled the project at issue here under Process Three. The bulletin stated, "Process Two and Three permit decisions are appealable to the Planning Commission. Process Four permit decisions are appealable to the City Council. Appeals of Environmental Determinations may be made after all project appeal rights have been exhausted." It further stated, "All appeals must be made in accordance with the procedures listed in Chapter 11, Article 2, Division 5. All appeals must be made no later than close of business, within ten (10) business days of the original decision date (Process Three and Four) . . . ." The bulletin specified the filing location for "Process Two and Three Decisions Appealable to the Planning Commission" as the City's Development Services Department, and the filing location for "Process Four Decisions and

13

Environmental Determinations Appealable to the City Council" as the City Clerk's Office.[2]

*Appeal to the Planning Commission*

CLL appealed the hearing officer's decision to the Planning Commission on a City form, DS-3031. CLL selected "Process Three Decision - Appeal to the Planning Commission" as the "Type of Appeal." It filed the form with the City's Development Services Department. It did not select "Environmental Determination - Appeal to City Council" or file the form with the City Clerk's Office.

CLL identified numerous grounds for appeal. It contended the hearing officer's findings under CEQA and in the final MND were not supported, including in the areas of traffic and transportation, noise, hazards, and cultural resources. It also contended the project's approval conflicted with the City's historical resource regulations and the Carmel Valley Neighborhood 8 Precise Plan.

In a report to the Planning Commission, City staff recommended that CLL's appeal be denied. After recounting the conditions at the site and the description of the project, the report addressed the issues identified by CLL's appeal. The report noted that an MND had been adopted by the hearing officer, but no appeal had been filed challenging that environmental determination. The report stated that the time to appeal had expired 10 business days after the hearing officer's decision, so any issues based on

---

[2]    As we will discuss in detail below, the parties dispute the accuracy of the descriptions of the City's appeal procedure in Information Bulletin 505 and the public hearing notice.

14

CEQA or the MND had been waived. The report rejected CLL's contention that the City failed to comply with its historical resources regulations. The project would maintain the existing historic farmhouse, and the new construction was consistent with the farmhouse's aesthetics. Based on these facts, the project was consistent with federal standards for historical resource preservation and did not require a site development permit under the City's historical resource regulations. (A site development permit was required, however, based on its location in the Carmel Valley community plan area.) The report further rejected CLL's contention that the project conflicted with the community plan's open space designation for reasons previously discussed.

CLL objected to the report's characterization of its appeal. In correspondence with City staff, CLL argued it had appealed the hearing officer's environmental determination, as evidenced by its statement of the grounds of appeal. CLL claimed it was not required to appeal the environmental determination to the City Council until its other appeals had been exhausted, i.e., after the Planning Commission rendered its decision. City staff responded that CLL was welcome to present its argument to the Planning Commission.

At the Planning Commission's first hearing on the project, a commissioner asked the deputy city attorney present about the scope of CLL's appeal. The attorney responded that CLL had not properly appealed the hearing officer's environmental determination because it had not indicated on its appeal form that it was pursuing an appeal of that determination. She explained, "Had [the appropriate box] been checked, this appeal would be set before the City Council and would not be heard before this body." Later in the hearing, a commissioner expressed sympathy with CLL's position, finding it clear that

15

CLL attempted to appeal both the permit approvals and the environmental determination. She requested that the appeal be returned to City staff and calendared before the City Council. The deputy city attorney responded that the appeal procedures are laid out in the SDMC, and it would be impossible to transfer the appeal to the City Council. The commissioner further requested that the City's appeal form and information bulletin be revised to reflect the correct procedures. The attorney said they would follow-up on the commissioner's request. After hearing numerous speakers for and against the project, including both fire experts, the Planning Commission trailed consideration of the project to its next meeting.

At the next meeting, the commissioners questioned Cal Coast, CLL, and their representatives. However, the Planning Commission was unable to reach the four-vote threshold to act on the project. The vote on a motion to approve the project and deny CLL's appeal was three in favor and two opposed, with two not voting. Consideration of the project was trailed again to a future meeting.

When the Planning Commission considered the project a third time, a motion to approve the project and deny CLL's appeal prevailed on a vote of four in favor, two opposed, and one not voting. The Planning Commission's decision was memorialized in a resolution granting a coastal development permit and site development permit for the project. The resolution and permits included extensive findings regarding the project and its compliance with the City's land use policies.

*Attempted Appeal to the City Council*

CLL attempted to file an appeal of the Planning Commission's decision to the City Council. CLL used a redesigned form DS-3031 that identified the "Type of Appeal" as either "Appeal of the Project" or "Appeal of the Environmental Determination." The various City processes, and the body to which the appeal was made, were no longer identified on the form. CLL indicated it was appealing both the project and the environmental determination. As grounds for its appeal, CLL identified various environmental impacts it believed required preparation of an EIR, including transportation and traffic, fire hazards, land use and planning, noise, and historical resources. CLL also contended, among other things, that the MND should have been recirculated because the final MND contained significant revisions to the project and additional mitigation measures. To justify its appeal, CLL referenced language in the public hearing notice and information bulletin that purported to authorize an appeal of an environmental determination after all other appeal rights had been exhausted.

The City rejected CLL's appeal. In its rejection letter, the City stated that CLL's appeal challenging the environmental determination was untimely under the SDMC. The Planning Commission's approval of permitting for the project was final and not appealable.

*Appeal to the California Coastal Commission*

CLL then appealed to the California Coastal Commission. CLL argued, among other things, that the project was inconsistent with the City's Local Coastal Program (LCP). To support its argument, CLL pointed to the community plan's designation of the

17

area as open space and the historic status of the farmhouse at the site. CLL claimed the City failed to analyze the effect of the project on the functions of the open space, including the benefits of the CVREP recreation areas, and failed to follow its historical resource regulations. CLL also claimed the project would expose its horse ranch and users of nearby trails to increased fire hazards because of inadequate evacuation routes.

Coastal Commission staff assessed CLL's appeal and found it raised no substantial issue. The staff's report concluded the project was consistent with the LCP. The report rejected CLL's open space argument because the site had already been developed and disturbed, and it found the City had complied with its historical resource regulations. It further noted, "Fire safety and evacuation is not a[n] LCP issue; however, the development complies with all fire-related requirements including brush management and building design." The report referenced a number of project elements that would address fire hazards and fire safety.

The Coastal Commission's staff report concluded, "[T]here is strong and legal support for the City's determination that the proposed development is consistent with the certified LCP. . . . The extent and scope of the development is minor." At a public hearing, the Commission agreed with the report and found no substantial issue.

*Superior Court Proceedings*

CLL then filed the instant petition for writ of mandate and complaint for declaratory and injunctive relief, violation of procedural due process and equitable estoppel. The operative first amended petition and complaint alleged that the MND was improperly adopted because the project would have significant environmental impacts in

18

the areas already discussed above and because the final MND had significant new material that required recirculation. The petition and complaint repeated CLL's contentions that the community plan's open space designation prohibited the project and that the City failed to follow its historical resource regulations. The petition and complaint also challenged the City's appeal procedures. It alleged that the procedures did not comply with CEQA because they segregated environmental determinations from project approvals. It further alleged that the City did not provide adequate notice of the appellate procedures, thereby violating state law, the SDMC, and CLL's constitutional right to procedural due process. Finally, the petition and complaint alleged that the City should be equitably estopped from claiming that CLL had not adequately appealed adoption of the MND because the public hearing notice and other documents inaccurately described the appeal procedures.

After briefing and argument, the trial court denied the petition and rejected CLL's claims. The court concluded CLL failed to exhaust its administrative remedies in City proceedings by failing to properly appeal the hearing officer's environmental determination. It found the City was not estopped from asserting a defense based on administrative exhaustion and that the City's appeal procedure did not violate CEQA. Even if the defense did not apply, the court was unpersuaded that adoption of the MND was unjustified. The court explained, "The court agrees with the City and [Cal Coast] that much of what motivated petitioners' objection to the building of the school next door has nothing to do with environmental concerns. Petitioners just do not want the academy as a neighbor because they feel it will affect them adversely from an economic

19

perspective."  The court did not believe there was a fair argument that the project would significantly impact the environment.  It stated, "The dominant neighbor of the proposed academy is [State Route] 56, hardly an environmentally sensitive area.  The building proposed is small (5340 sq. ft. in a single story), and it will be unoccupied more days and hours than not.  It strikes the court that requiring an expensive, time-consuming, and likely to be challenged EIR for this modest project, which is about the size of a large home, would be overkill."  The court found CLL's remaining arguments unpersuasive and entered judgment accordingly.  CLL appeals.

DISCUSSION

I

*CEQA Overview*

"CEQA was enacted to advance four related purposes:  to (1) inform the government and public about a proposed activity's potential environmental impacts; (2) identify ways to reduce, or avoid, environmental damage; (3) prevent environmental damage by requiring project changes via alternatives or mitigation measures when feasible; and (4) disclose to the public the rationale for governmental approval of a project that may significantly impact the environment."  (*California Building Industry Assn. v. Bay Area Air Quality Management Dist.* (2015) 62 Cal.4th 369, 382 (*CBIA*).)

CEQA primarily advances these purposes through its requirement that a state or local agency prepare an EIR before pursuing or approving any project falling within CEQA's scope that may have a significant impact on the environment.  (§§ 21100, subd. (a), 21151, subd. (a).)  "An [EIR] is an informational document which, when its

20

preparation is required . . . , shall be considered by every public agency prior to its approval or disapproval of a project." (§ 21061.)

" 'If the agency's initial study of a project produces substantial evidence supporting a fair argument the project may have significant adverse effects, the agency must (assuming the project is not exempt from CEQA) prepare an EIR.' " (*Save the Plastic Bag Coalition v. City of Manhattan Beach* (2011) 52 Cal.4th 155, 171 (*Save the Plastic Bag*).) "If, on the other hand, '[t]here is no substantial evidence, in light of the whole record . . . that the project may have a significant effect on the environment,' the agency may adopt a negative declaration." (*Ibid.*)

A negative declaration is "a written statement briefly describing the reasons that a proposed project will not have a significant effect on the environment and does not require the preparation of an environmental impact report." (§ 21064.) An MND is "a negative declaration prepared for a project when the initial study has identified potentially significant effects on the environment, but (1) revisions in the project plans or proposals made by, or agreed to by, the applicant before the proposed negative declaration and initial study are released for public review would avoid the effects or mitigate the effects to a point where clearly no significant effect on the environment would occur, and (2) there is no substantial evidence in light of the whole record before the public agency that the project, as revised, may have a significant effect on the environment." (§ 21064.5.)

## II

### *Exhaustion of Administrative Remedies*

"The exhaustion of administrative remedies doctrine 'bars the pursuit of a judicial remedy by a person to whom administrative action was available for the purpose of enforcing the right he seeks to assert in court, but who has failed to commence such action and is attempting to obtain judicial redress where no administrative proceeding has occurred at all; it also operates as a defense to litigation commenced by persons who have been aggrieved by action taken in an administrative proceeding which has in fact occurred but who have failed to "exhaust" the remedy available to them in the course of the proceeding itself. [Citation.] As our Supreme Court has stated it: 'In brief, the rule is that where an administrative remedy is provided by statute, relief must be sought from the administrative body and this remedy exhausted before the courts will act.' [Citation.] The rule is a jurisdictional prerequisite in the sense that it 'is not a matter of judicial discretion, but is a fundamental rule of procedure laid down by courts of last resort, followed under the doctrine of *stare decisis*, and binding upon all courts.' " (*Citizens for Open Government v. City of Lodi* (2006) 144 Cal.App.4th 865, 874 (*Citizens for Open Government*).)

For example, if the administrative proceeding includes a right to appeal an allegedly improper action, a plaintiff must generally pursue that administrative appeal in order to exhaust his or her administrative remedies. " 'If some reasonable administrative remedy, such as the right to appeal the action of a planning commission, were afforded to challenge such improper action the doctrine of administrative remedies would bar suit by

litigants who failed to employ it.' " (*Tahoe Vista Concerned Citizens v. County of Placer* (2000) 81 Cal.App.4th 577, 590 (*Tahoe Vista*); see *Sea & Sage Audubon Society, Inc. v. Planning Com.* (1983) 34 Cal.3d 412, 417-418.)[3]

Because this exhaustion requirement depends on the availability of a remedy within the administrative proceeding, we must examine the procedures applicable to the proceeding.  " 'Consideration of whether such exhaustion has occurred in a given case will depend upon the procedures applicable to the public agency in question.' " (*Tahoe Vista, supra*, 81 Cal.App.4th at p. 591.)

"We apply a de novo standard of review to the legal question of whether the doctrine of exhaustion of administrative remedies applies in a given case." (*Citizens for Open Government, supra*, 144 Cal.App.4th at p. 873.)  We likewise review de novo the trial court's interpretation of the applicable provisions of the SDMC.  (*Save Our Heritage Organisation v. City of San Diego* (2015) 237 Cal.App.4th 163, 174.)

---

[3]     This exhaustion requirement is separate from, and in addition to, the requirements under CEQA that (1) any grounds for noncompliance with CEQA must be presented to the public agency before its decision and (2) a prospective plaintiff must object to approval of the project in order to have standing to seek judicial remedies.  (§ 21177, subds. (a) & (b).)  Cal Coast and the City proffer defenses based on these requirements as well, but we need not consider them because we reject CLL's contentions on the merits in the following sections.  Although courts have described section 21177 as "codif[ying] the doctrine of exhaustion of administrative remedies for CEQA" (*Citizens for Open Government, supra*, 144 Cal.App.4th at p. 875), it does not cover every circumstance where the doctrine applies.  (See *Tahoe Vista, supra*, 81 Cal.App.4th at p. 590 ["Notwithstanding the Legislature's expressed intent, section 21177 is not properly speaking an exhaustion of administrative remedies statute."].)  Section 21177 does not apply here, for example, where the plaintiff raises a ground for noncompliance before a public agency's decision but does not pursue available administrative procedures to challenge that decision.

As noted, the City has established five "decision processes" to handle applications for permits, maps, and other planning decisions. (SDMC, § 112.0501.) The City applied its "Process Three" to Cal Coast's application. Under Process Three, an application may be approved, conditionally approved, or denied by a hearing officer at a public hearing. (*Id.*, § 112.0505.) The hearing officer must comply with CEQA's environmental review and certify or adopt the appropriate environmental document (e.g., negative declaration, MND, or EIR). (*Id.*, § 128.0311, subd. (a).) The hearing officer's decision may be appealed to the Planning Commission within 10 business days by filing an application with the City Manager. (*Id.*, § 112.0506.) The Planning Commission may affirm, reverse, or modify the decision being appealed. (*Id.*, § 112.0506, subd. (f).)

The SDMC contains a separate section describing the procedure for environmental determination appeals. (SDMC, § 112.0520.) The SDMC defines an "environmental determination" as "a decision by any non-elected City decisionmaker, to certify an environmental impact report, adopt a negative declaration or mitigated negative declaration, or to determine that a project is exempt from [CEQA] . . . ." (*Id.*, § 113.0103.) The procedure for environmental determination appeals applies regardless of the decision process adopted by the City: "Notwithstanding other provisions of this Code, any person may appeal an environmental determination not made by the City Council." (*Id.*, § 112.0520, subd. (a), italics omitted.) An environmental determination appeal must be filed with the City Clerk within 10 business days of either "the date of posting of the Notice of Right to Appeal Environmental Determination" or "the date of a

24

decision by a Hearing Officer or the Planning Commission to adopt or certify an environmental document." (*Id.*, § 112.0520, subd. (b).)

The City Council may grant or deny the appeal. (*Id.*, § 112.0520, subd. (e).) If the City Council denies the appeal, it will "approve the environmental determination and adopt the CEQA findings and statement of overriding considerations of the previous decision-maker, where appropriate." (*Id.*, § 112.0520, subd. (e)(2), italics omitted.) If the City Council grants the appeal, it will set aside the environmental determination and return it to City staff for reconsideration. (*Id.*, § 112.0520, subd. (e)(2), (f)(2).) "The Planning Director shall reconsider the environmental determination . . . and prepare a revised environmental document as appropriate, in consideration of any direction from the City Council." (*Id.*, § 112.0520, subd. (f)(2), italics omitted.) During this time, "[t]he lower decision-maker's decision to approve the project shall be held in abeyance. The City Council shall retain jurisdiction to act on the revised environmental document and associated project at a subsequent public hearing." (*Id.*, § 112.0520, subd. (f)(1).)

At the subsequent hearing, the City Council has the power to consider the revised environmental document and the associated project. "At a subsequent hearing, the City Council shall again consider the environmental determination and associated projects, and may take action as follows:  [¶]  (A) Certify or adopt the environmental document; adopt CEQA findings and statement of overriding considerations as appropriate; and affirm the previous decision to approve the associated project; [¶]  (B) Certify or adopt the environmental document; adopt CEQA findings and statement of overriding considerations as appropriate; condition and approve the associated project as modified;

25

or [¶] (C) Find that the environmental document is insufficient, in which case the document shall not be certified. The associated project shall be denied and the decision shall be deemed the final administrative action." (SDMC, § 112.0520, subd. (f)(3), italics omitted.)

Taken together, these provisions establish a bifurcated appeals procedure for Process Three decisions made by a hearing officer. While a hearing officer's "decision" may be appealed to the Planning Commission within 10 business days (SDMC, § 112.0506, subd. (b)), any environmental determination by the hearing officer must simultaneously be appealed to the City Council within the same period (*id.*, § 112.0520, subd. (b)(2)). As a result of this bifurcation, an appeal to the Planning Commission covers only the nonenvironmental project approvals (e.g., permits), while an appeal to the City Council covers the environmental determination. If the City Council grants the appeal, however, it may consider the non-environmental project approvals as well.

The sequencing and interaction of these two appeals is unclear, but we need not delve further into City procedure in order to resolve the dispute before us. CLL filed only an appeal of the hearing officer's decision to the Planning Commission. It did not file an appeal of the hearing officer's environmental determination. It therefore did not avail itself of the City's administrative appeals procedure that was available to address CLL's objections to the hearing officer's adoption of the MND. CLL did not exhaust its

administrative remedies regarding the MND, and it may not now bring a judicial action challenging it. (See *Tahoe Vista, supra*, 81 Cal.App.4th at p. 592.)[4]

CLL argues its failure to appeal the hearing officer's environmental determination is excused because the City's bifurcated appeal procedures are invalid under CEQA. (See *California Clean Energy Committee v. City of San Jose* (2013) 220 Cal.App.4th 1325, 1346 (*California Clean Energy*).) CEQA requires the person or persons responsible for approving a project (the "decisionmaking body" in CEQA parlance) also be responsible for complying with CEQA's environmental review (e.g., by certifying an EIR, adopting a negative declaration or MND, or determining that the project is exempt). (See Guidelines, §§ 15025, subd. (b), 15356.) Assuming authority is properly delegated within the public agency, the decisionmaking body may be an unelected official or commission. (*California Clean Energy,* at p. 1336 & fn. 3.) If the decisionmaking body is unelected, however, the decisionmaking body's compliance with CEQA must be appealable to the agency's elected decisionmaking body, if any. (§ 21151, subd. (c); Guidelines, §§ 15061, subd. (e), 15074, subd. (f), 15090, subd. (b).)

---

4    CLL claims that its appeal from the Planning Commission's decision was sufficient to appeal the environmental determination to the City Council. CLL relies on the SDMC provision governing the timing of environmental determination appeals, which must be filed "[w]ithin 10 business days from the date of a decision by a Hearing Officer *or the Planning Commission* to adopt or certify an environmental document." (SDMC, § 112.0520, subd. (b), italics added.) But, under the City's Process Three, it was the hearing officer who adopted the environmental document, not the Planning Commission. CLL therefore had 10 business days from the hearing officer's decision to appeal the environmental determination. The later Planning Commission decision on nonenvironmental matters did not reset the time to appeal.

27

The City's procedure, at least as relevant here, complies with these requirements. Under Process Three, the hearing officer has the authority to approve the project and comply with CEQA's environmental review. (SDMC, §§ 112.0505, 128.0311, subd. (a).) The hearing officer is therefore the City's decisionmaking body under the Guidelines. And, because the hearing officer is unelected, the City's procedures allow an appeal of the hearing officer's environmental determination to the City's elected City Council. (SDMC, § 112.0520.) CLL simply did not avail itself of that procedure.

CLL relies on *California Clean Energy, supra*, 220 Cal.App.4th 1325, but it is inapposite. In that case, the local agency had delegated the authority to comply with CEQA's environmental review to its planning commission. (*Id.* at p. 1337.) This delegation was improper because the planning commission did not have the authority to approve the project at issue. (*Id.* at pp. 1338, 1340.) The planning commission's purported certification of a final EIR for the project was therefore unauthorized by CEQA, and the plaintiff's challenge to that certification was not barred by its failure to appeal the planning commission's environmental decision. (*Id.* at p. 1346.) Here, the hearing officer's adoption of an MND for the project was procedurally proper, since the hearing officer also had the authority to approve the project. *California Clean Energy* does not apply.

The other authorities CLL cites confirm that the hearing officer's adoption of the MND was procedurally proper because he was the City's decisionmaking body for the project. (See *POET, LLC v. State Air Resources Bd.* (2013) 218 Cal.App.4th 681, 731 ["For an environmental review document to serve CEQA's basic purpose of informing

28

governmental decision makers about environmental issues, that document must be reviewed and considered by the same person or group of persons who make the decision to approve or disapprove the project at issue."]; *Kleist v. City of Glendale* (1976) 56 Cal.App.3d 770, 778 ["The state guidelines require that the decision-making body or administrative official having final approval authority over a project involving a substantial effect upon the environment review and consider an EIR before taking action to approve or disapprove the project."]; see also *El Morro Community Assn. v. California Dept. of Parks & Recreation* (2004) 122 Cal.App.4th 1341, 1349-1350 ["Guidelines, section 15356 specifically defines the '[decisionmaking] body' as 'any *person* or group of people within a public agency permitted by law to approve or disapprove the project at issue.' "].)  The City's procedure establishing an appeal to the City Council to challenge the hearing officer's adoption of the MND was likewise proper.  (See *Vedanta Society of So. California v. California Quartet, Ltd.* (2000) 84 Cal.App.4th 517, 527-528.)  CLL was required to pursue this appeal in order to exhaust its administrative remedies.

CLL argues that the City's appeal procedures are inadequate because the Planning Commission has authority over project approvals but not the environmental determination.  But this alleged inadequacy does not affect the validity of the hearing officer's environmental determination, so it provides no excuse for CLL's failure to appeal that determination.  (Cf. *California Clean Energy, supra*, 220 Cal.App.4th at p. 1346.)  In addition, it is unclear on the current record which procedure would have applied had CLL properly appealed the environmental determination.  During the first Planning Commission meeting below, a deputy city attorney told the commissioners,

"Had [the appropriate box] been checked, this appeal would be set before the City Council and would not be heard before this body."

CLL also argues the City Council is not a "decisionmaking body" because project approval under Process Three progresses from the hearing officer to the Planning Commission. (SDMC, § 112.0506.) No independent appeal to the City Council, separate from an environmental determination, is authorized. (*Ibid.*) The Planning Commission's decision is final. In CLL's view, the City Council is therefore not a "person or group of people within a public agency permitted by law to approve or disapprove the project at issue." (Guidelines, § 15356.) If the City grants the environmental determination appeal, however, it has such authority. (SDMC, § 112.0520, subd. (f).) Neither CEQA nor the Guidelines require that a local agency's elected decisionmaking body accept appeals regarding every project approval, separate and apart from environmental review. They require only that the environmental determination be appealable. (§ 21151, subd. (c); Guidelines, §§ 15061, subd. (e), 15074, subd. (f), 15090, subd. (b).) The City's procedures allow exactly that.

CLL further claims its failure to appeal should be excused based on inaccurate descriptions of the City's appeal process in the public hearing notice for Cal Coast's project and the City's Information Bulletin 505. The public hearing notice misstated the procedure for an environmental determination appeal by implying that the appeal should occur after the Planning Commission considered the project: "The adoption of [an MND] may be appealed to the City Council after all other appeal rights have been exhausted. All such appeals must be filed by 5:00 PM within ten (10) business days from the date of

30

the Planning Commission's certification/adoption of the environmental document." Under the SDMC, the appeal to City Council for a Process Three project does not occur "after all other appeal rights have been exhausted;" it occurs simultaneously with the appeal to the Planning Commission. And, while the notice's reference to an appeal "within ten (10) business days of the Planning Commission's certification/adoption of the environmental document" may be applicable to other projects (see, e.g., SDMC, § 112.0507 [describing the City's Process Four]), it is not accurate under the Process Three procedures the City applied to this project because the time to appeal ran from the hearing officer's adoption of the environmental document. The City's information bulletin, which was referenced in the public hearing notice, states that appeals must be made in accordance with the SDMC and does not describe the specific procedures, except to state, "Appeals of Environmental Determinations may be made after all project appeal rights have been exhausted." Again, this statement incorrectly describes the sequencing of the project and environmental determination appeals under Process Three, which must be pursued simultaneously.

CLL primarily frames its argument based on these inaccuracies as one of improper notice under CEQA. This framing does not fit the facts here. The authorities CLL cites discuss the failure to comply with CEQA's requirement that an "alleged grounds for noncompliance" with CEQA be presented to a public agency under section 21177, subdivision (a). (See *Temecula Band of Luiseno Mission Indians v. Rancho Cal. Water Dist.* (1996) 43 Cal.App.4th 425, 433-435 (*Temecula Band*); *McQueen v. Board of Directors* (1988) 202 Cal.App.3d 1136, 1150-1151 (*McQueen*).) This requirement "does

31

not apply to any alleged grounds for noncompliance with this division for which there was no public hearing or other opportunity for members of the public to raise those objections orally or in writing prior to the approval of the project, or if the public agency failed to give the notice required by law." (§ 21177, subd. (e).) In *McQueen*, the court held that an inaccurate and misleading project description is "tantamount to a lack of notice" under CEQA, thus excusing the plaintiff's failure to raise a noncompliance issue early in the public agency's consideration of the project. (*McQueen, supra*, at p. 1150.) *Temecula Band* agreed with *McQueen*'s interpretation of the statute, but it distinguished *McQueen* on the facts. (*Temecula Band, supra*, at p. 434.) While the project description was inaccurate and misleading, as in *McQueen*, the project was clarified at a subsequent public hearing. (*Ibid.*) The plaintiff failed to object after that clarification, despite an opportunity to do so, and therefore its failure to raise a noncompliance issue was not excused. (*Ibid.*)

CLL's failure to appeal is not a failure to raise a noncompliance issue under section 21177. *McQueen* and *Temecula Band* therefore have little relevance to the administrative exhaustion issue here. And, even taken on their own terms, these authorities stand only for the proposition that a plaintiff should be excused from failing to raise a noncompliance issue where a misleading project description—or complete lack of notice—has misled a plaintiff into believing there is no noncompliance issue at all. (§ 21177, subd. (e); *Temecula Band, supra*, 43 Cal.App.4th at p. 434.) It does not apply where the public agency has accurately provided notice of a public hearing, but it misstates the applicable procedures to appeal the decision made at that hearing.

32

Instead, a plaintiff's remedy in this situation is to prevent the public agency from invoking an administrative exhaustion defense through equitable estoppel. (See *Shuer v. County of San Diego* (2004) 117 Cal.App.4th 476, 487 ["We find, however, that the sum total of county's actions . . . negligently led [the plaintiff] to conclude that she had no administrative recourse. That being the case, county is estopped from asserting in its demurrer that [the plaintiff] failed to exhaust her administrative remedies."]; see also *Feduniak v. California Coastal Com.* (2007) 148 Cal.App.4th 1346, 1372 ["[C]ourts will not hesitate to estop the government from asserting *a procedural barrier*, such as the statute of limitations or a failure to exhaust remedies, as a defense to claims against it, where the government's affirmative conduct caused the claimant's failure to comply with the procedural requirement."]; *J.H. McKnight Ranch, Inc. v. Franchise Tax Bd.* (2003) 110 Cal.App.4th 978, 991; but see *Park Area Neighbors v. Town of Fairfax* (1994) 29 Cal.App.4th 1442, 1449-1450 [equitable estoppel inapplicable to representations on matters of law; inaccurate statements did not excuse failure to exhaust administrative remedies].) CLL pursued a claim for equitable estoppel in the trial court, but it was unsuccessful. CLL has not raised any claim of error regarding equitable estoppel in this court. Its failure to exhaust administrative remedies therefore may not be excused on that basis.

III

*Adoption of the MND*

Although we have found that CLL failed to exhaust its administrative remedies regarding the City's adoption of an MND for the project, we will nonetheless consider

33

CLL's substantive arguments as an alternative ground for our decision. CLL primarily argues the hearing officer should not have adopted the MND because the record demonstrated a fair argument that the project may have a significant effect on the environment that would not be mitigated. CLL contends the City was therefore required to prepare an EIR for the project.

An EIR must be prepared "[i]f there is substantial evidence, in light of the whole record before the lead agency, that the project may have a significant effect on the environment . . . ." (§ 21080, subd. (d).) " 'May' means a reasonable possibility." (*Pocket Protectors v. City of Sacramento* (2004) 124 Cal.App.4th 903, 927 (*Pocket Protectors*).)

" 'Environment' means the physical conditions which exist within the area which will be affected by a proposed project, including land, air, water, minerals, flora, fauna, noise, objects of historic or aesthetic significance." (§ 21060.5.) " 'Significant effect on the environment' means a substantial, or potentially substantial, adverse change in the environment." (§ 21068.) "An economic or social change by itself shall not be considered a significant effect on the environment. A social or economic change related to a physical change may be considered in determining whether the physical change is significant." (Guidelines, § 15382; see § 21082.2, subd. (c).)

"[S]ubstantial evidence includes fact, a reasonable assumption predicated upon fact, or expert opinion supported by fact." (§ 21080, subd. (e)(1).) "Substantial evidence is not argument, speculation, unsubstantiated opinion or narrative, evidence that is clearly inaccurate or erroneous, or evidence of social or economic impacts that do not contribute

to, or are not caused by, physical impacts on the environment."  (§ 21080, subd. (e)(2).) "The existence of public controversy over the environmental effects of a project shall not require preparation of an environmental impact report if there is no substantial evidence in light of the whole record before the lead agency that the project may have a significant effect on the environment."  (§ 21082.2, subd. (b).)  "Relevant personal observations of area residents on nontechnical subjects may qualify as substantial evidence . . . . [Citations.]  So may expert opinion if supported by facts, even if not based on specific observations as to the site under review."  (*Pocket Protectors, supra*, 124 Cal.App.4th at p. 928.)

The agency does not weigh the potential effect on the environment if substantial evidence supports both the preparation of an EIR and the opposite.  "[I]f a lead agency is presented with a fair argument that a project may have a significant effect on the environment, the lead agency shall prepare an EIR even though it may also be presented with other substantial evidence that the project will not have a significant effect." (Guidelines, § 15064, subd. (f)(1); see *No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 75.)  For example, "[i]f there is disagreement among expert opinion supported by facts over the significance of an effect on the environment, the Lead Agency shall treat the effect as significant and shall prepare an EIR."  (Guidelines, § 15064, subd. (g).) "The fair argument standard creates a 'low threshold' for requiring an EIR, reflecting a legislative preference for resolving doubts in favor of environmental review."  (*Preserve Poway v. City of Poway* (2016) 245 Cal.App.4th 560, 576.)

The hearing officer's "decision to issue a negative declaration in connection with [the project] is reviewed for 'prejudicial abuse of discretion,' which 'is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' " (*Save the Plastic Bag, supra*, 52 Cal.4th at p. 171, quoting § 21168.5.) " 'In reviewing the adoption of [a negative declaration], our task is to determine whether there is substantial evidence in the record supporting a fair argument that the Project will significantly impact the environment; if there is, it was an abuse of discretion not to require an EIR. [Citation.] " 'Whether a fair argument can be made is to be determined by examining the entire record.' " [Citation.]' [Citation.] 'Although our review is de novo and nondeferential, we must give the lead agency the benefit of the doubt on any legitimate, disputed issues of credibility.' " (*Joshua Tree Downtown Business Alliance v. County of San Bernardino* (2016) 1 Cal.App.5th 677, 684 (*Joshua Tree*).)

As the appellant, CLL bears the burden of identifying in the record substantial evidence of a fair argument that the project may have a significant effect on the environment that would not be mitigated. (See *Citizens for Responsible and Open Government v. City of Grand Terrace* (2008) 160 Cal.App.4th 1323, 1332.) CLL contends the project may have significant effects in the areas of fire hazards, traffic and transportation, noise, recreation, and historical resources.

For reasons we will explain, CLL has not made a sufficient showing here. The project at issue is relatively modest and located on already-developed land. The record does not reflect any fair argument that the project may have a significant effect on the

36

environment that would not be mitigated.  We will address each of the areas CLL

identifies in turn.[5]

*Fire Hazards*

A project may have a significant effect on the environment by increasing the risk

of fire hazards, including wildfires.  Here, however, CLL has not shown the project

would have any significant effect on fire hazards in the area.  The project meets all

applicable fire codes, the project site is already developed, and CLL's large commercial

horse ranch already operates on the neighboring parcel.  The area already sees vehicular

and pedestrian traffic.  CLL has not shown any of the project's activities have a

reasonable possibility of significantly increasing the risk of fire hazards.  Indeed, by

incorporating a new water line and fire hydrant, the project appears to increase fire safety

in the area.

CLL focuses on the location of the project in a Very High Fire Hazard Severity

Zone (see Gov. Code, § 51178) and the risk to persons and property from potential

wildfires in the area.  CLL's focus is misplaced.  As our Supreme Court has explained,

"we must distinguish between requirements that consider the *environment's* effects on a

project and those that contemplate the *project's* impacts on the existing environment."

(*CBIA, supra*, 62 Cal.4th at p. 388.)  Only the latter impacts are valid under CEQA.  It is

---

5      CLL's opening brief presents its argument that there was substantial evidence in chronological order, identifying in turn bits of evidence in the City's initial study, comments to the draft and final MND, and testimony before the hearing officer and at the Planning Commission.  Presenting this information chronologically, rather than by topic, makes our review of CLL's argument more difficult and lessens its persuasive value.

proper to evaluate "a project's potentially significant *exacerbating* effects on existing environmental hazards—effects that arise because the project brings 'development and people into the area affected.' " (*Ibid.*) But considering existing environmental hazards, unchanged by the project, are not proper under CEQA. "CEQA generally does not require an analysis of how existing environmental conditions will impact a project's future users or residents." (*Id.* at p. 386.)[6]

CLL argues the project will inhibit the ability of people and, at the ranch, animals to evacuate in the event of a wildfire. CLL points to the alleged "inability to timely and safely evacuate 95 school personnel and students in conjunction with [CLL's] 135 horses and 15 cattle, ranch personnel, clients and trailers through the narrow Clews Ranch Road." But Clews Ranch Road is 20 feet wide and only 1,650 feet long. Complaints about its inadequacy are speculative. The project will also have an alternate evacuation route westward along a dirt road, and it intends to operate only part of the year and will close on red flag warning days. The inherent difficulty in evacuating "135 horses and 15 cattle, ranch personnel, clients and trailers" already exists and will not be significantly affected by the project. Viewing the record as a whole, there is no fair argument that the project will materially affect evacuation routes in the area.

CLL relies on the comments submitted by its fire safety expert, Van Collingsworth. His comments consist largely of general observations regarding fire

---

6    CEQA provides for exceptions to this general rule in certain specific contexts, including school construction projects near hazardous waste disposal sites or freeways. (§ 21151.8, subd. (a)(3)(B); see *CBIA, supra*, 62 Cal.4th at p. 391.) Very High Fire Hazard Severity Zones are not included.

hazards not tied to the project, questions about the project, and topics allegedly unaddressed or inadequately addressed in the MND and project materials. His general observations cannot, in and of themselves, create a fair argument without some nexus with the project itself. His questions about the project and the topics allegedly unaddressed or inadequately addressed also cannot create a fair argument without some showing that those questions and topics refer to a potentially significant effect on the environment that the project may create. Collingsworth also focuses on the effect of the environment on the project (students and faculty at the school), rather than the effect of the project on the environment, which is incorrect for the reasons we have already discussed. Collingsworth's remaining comments are conclusory, speculative, or otherwise unsupported. They are likewise insufficient.

CLL has not shown that there is a fair argument that the project's effect on the fire hazards in the environment, including as a consequence of bringing additional people into the area, may be significant. The City therefore was not required to prepare an EIR on this basis.

*Traffic and Transportation*

A project may have a significant effect on the environment by increasing traffic or impeding transportation. Various comments from the public argued the project here would create an unreasonable traffic situation on Clews Ranch Road. They claimed that the road could not support the estimated 117 additional daily trips caused by the project because the road was narrow, "may create conflicts for two-way traffic," and was used by pedestrians and horses as well. Barbara Clews and others contended that there were also

39

"blind corners" on the road.  As to the last comment, it appears contradicted by the actual condition of the road, which is only 1,650 feet long and largely straight.  On direct issues of credibility, we must defer to the hearing officer.  (See *Joshua Tree, supra*, 1 Cal.App.5th at p. 684.)  The remaining comments are insufficient to create a fair argument that the project may have a significant impact on traffic and transportation.  Clews Ranch Road was 20 feet wide and allowed two-way traffic.  It had supported traffic to and from CLL's large commercial horse ranch and the project site, including during special events, without incident.

The factual situation here is far different from the situation in *Keep Our Mountains Quiet v. County of Santa Clara* (2015) 236 Cal.App.4th 714, which CLL cites.  In that case, an initial report by the California Department of Transportation found there would be " 'significant impacts to the operations and traffic movements to the site entrances' and 'might impede [Summit Road] in both directions because of numerous vehicles making right and left-turns into the site.' "  (*Id.* at p. 725.)  The road leading to the project site was winding and very narrow (under 10 feet at one point), with 39 blind curves.  (*Id.* at p. 727.)  The accident rate was twice the statewide average.  (*Id.* at pp. 726-727.)  No such facts were developed here.

The commenters' predictions of significant impacts alone are insufficient absent specific facts in the record supporting a fair argument.  " '[I]n the absence of a specific factual foundation in the record, dire predictions by nonexperts regarding the consequences of a project do not constitute substantial evidence.' "  (*Joshua Tree, supra*, 1 Cal.App.5th at p. 690.)  CLL has not shown that there is a fair argument that the

40

project's effect on traffic and transportation may be significant.  The City was not required to prepare an EIR on this basis.

*Noise*

A project may have a significant effect on the environment through the noise it generates.  (See *Oro Fino Gold Mining Corp. v. County of El Dorado* (1990) 225 Cal.App.3d 872, 882 [noise generated by gold mine's drilling rig].)  Several commenters associated with CLL's horse ranch predicted significant noise impacts because noises from school activities could disrupt ranch operations.  For example, one commenter described incidents in which construction noise at the project site had frightened horses and caused them to throw their riders.  But the possibility that noise will impact the horse ranch's operations is insufficient.  "Under CEQA, the question is whether a project will affect the environment of persons in general, not whether a project will affect particular persons."  (*Mira Mar Mobile Community v. City of Oceanside* (2004) 119 Cal.App.4th 477, 492.)  The noise likely generated by the school (children laughing and playing, cars driving, doors closing, etc.) is insignificant in the context of the environment as a whole, especially given the project's location near a busy highway, State Route 56, and CLL's large ranch.

Even if the noise generated by the school adversely impacted the ability of the ranch to continue operation as a viable business, the impact on the ranch alone would be insufficient to support preparation of an EIR.  The fact that a project may affect another business's economic viability is not an effect covered by CEQA unless it results in a change in the physical environment (e.g., urban decay).  (*Joshua Tree, supra*, 1

41

Cal.App.5th at p. 685.) CLL has not shown that there is a fair argument that the project's effect on noise in the environment may be significant. The City was not required to prepare an EIR on this basis.

*Recreation*

A project may have a significant effect on the environment if it reduces available recreation activities. The project here will use a public parking lot serving nearby trails as a pick-up and drop-off point for its shuttles. Commenters believed the school's use of the parking lot would leave little room for other users. For example, the CVCPB expressed concern that "[u]nresolved operational issues such as the drop-off and pickup location may impact traffic flow on Carmel Country Road and [the location] may be inadequate for the added use beyond much needed parking for the heavily used CVREP public trails." Speculation by commenters such as the CVCPB is not substantial evidence, and it is insufficient to support a fair argument that the project may have a significant impact on recreation. (*Joshua Tree, supra*, 1 Cal.App.5th at p. 690.) CLL has not shown the City was required to prepare an EIR on this basis.

*Historical Resources*

A project may have a significant effect on the environment if it affects historical resources. The project here would not alter the historic farmhouse on the site or its outbuildings, and the architecture of the new school on the property is consistent with the farmhouse's aesthetic. CLL claims the City should have undertaken additional study of the project's impact on the broader Mount Carmel Ranch historical resource, but such criticism is mere rhetoric without facts supporting such an impact. CLL has not shown

42

that there is a fair argument that the project's effect on historical resources may be significant. The City was not required to prepare an EIR on this basis. We will address the City's compliance with its historical resource regulations in part IV, *post*.

IV

*Recirculation of the MND*

To achieve the public notice purposes of CEQA, an MND must be recirculated if it is substantially revised after its release but prior to adoption. (Guidelines, § 15073.5, subd. (a).) A substantial revision includes the circumstances where "[a] new, avoidable significant effect is identified and mitigation measures or project revisions must be added in order to reduce the effect to insignificance," or "[t]he lead agency determines that the proposed mitigation measures or project revisions will not reduce potential effects to less than significance and new measures or revisions must be required." (Guidelines, § 15073.5, subd. (b)(1)-(2).) Recirculation is not required where "[n]ew project revisions are added in response to written or verbal comments on the project's effects identified in the proposed negative declaration which are not new avoidable significant effects"; "[m]easures or conditions of project approval are added after circulation of the negative declaration which are not required by CEQA, which do not create new significant environmental effects and are not necessary to mitigate an avoidable significant effect"; or "[n]ew information is added to the negative declaration which merely clarifies, amplifies, or makes insignificant modifications to the negative declaration." (Guidelines, § 15073.5, subd. (c)(2)-(4).)

CLL contends the school's shuttle bus plan and its intent to close on red flag warning days, which were added to the project after the MND was circulated, constitute new mitigation measures that required recirculation. We disagree. These plans were purely voluntary, so they cannot constitute mitigation measures. (Guidelines, § 15126.4, subd. (a)(2).) And CLL has not shown they were added to the project to reduce *significant* effects on the environment for the reasons discussed above. Moreover, additional information about the project's design and layout, its evacuation plan, and its brush management plan, which were also added after circulation, were clarifying and amplifying in nature and did not make substantial revisions to the project. (See Guidelines, § 15126.4, subd. (c)(4).) Recirculation was not required.

V

*Historical Resource Regulations*

CLL contends the City failed to follow its historical resource regulations (SDMC, § 143.0201 et seq.) and the Historical Resources Guidelines of the City's Land Development Manual (HRG). To succeed, CLL must establish a prejudicial abuse of discretion, i.e., it must show that the City's actions were "arbitrary, capricious, in excess of its jurisdiction, entirely lacking in evidentiary support, or without reasonable or rational basis as a matter of law." (*Sierra Club v. County of Napa* (2004) 121 Cal.App.4th 1490, 1497 (*Sierra Club*).) "A prejudicial abuse of discretion is established if the agency has not proceeded in a manner required by law, if its decision is not supported by findings, or if its findings are not supported by substantial evidence in the record." (*Ibid.*; see § 21168.5)

44

CLL advances two interrelated arguments in an attempt to show the City did not proceed as required by law: (1) the historical resource regulations require the City to apply its "Process Four" to the project, which would involve review by the City's Historical Resources Board, and (2) the regulations require the City to analyze the effect of the project on Mount Carmel Ranch, the broader historical resource of which the project site's historic farmhouse is a part.

The City's historical resource regulations apply whenever historical resources, including designated historical resources, are present at a project site. (SDMC, § 143.0210, subd. (a)(1).) The City must proceed under Process Four for certain types of development when a designated historical resource is present. (*Id.*, § 126.0502, subd. (d)(1).) The types of development that require Process Four are subdivisions, single or multiple unit residential developments, commercial or industrial developments, public works projects, and any developments that deviate from the historical resources regulations. (*Ibid.*) The historical resources regulations similarly require Process Four for subdivisions, single or multiple unit residential developments, commercial or industrial developments, public works projects (other than capital improvement program projects), land use plans, and any developments that deviate from the historical resources regulations (other than capital improvement program projects). (*Id.*, § 143.0210, subd. (e)(2).)

Even if these requirements apply, the historical resource regulations contain certain exemptions. (SDMC, § 143.0220; see *id.*, §§ 126.0502, subd. (d)(1), 143.0210, subd. (e).) One of these exemptions covers "[a]ny development that proposes minor

45

alterations or improvements consistent with [SDMC] Section 143.0250, subdivision (a), to a designated historical resource, or any historical building or historical structure located within a historical district, or any new construction within a historical district that will enhance, restore, maintain, repair, or allow adaptive reuse of the resource and which will not adversely affect the special character or special historical, architectural, archaeological, or cultural value of the resource when all feasible measures to protect and preserve the historical resource are included in the development proposal consistent with the Secretary of Interior's Standards and Guidelines." (*Id.*, § 143.0220, subd. (a), italics omitted.)

In the report to the Planning Commission for the project, City staff explained that the project falls within this exemption because it is new construction that is consistent with the Secretary of the Interior's Standards and Guidelines, the HRG, and the historical resource regulations. In arguing that Process Four applies, CLL does not address the substance of this exemption. It merely criticizes the City's reliance on the exemption as a post hoc rationalization. Such criticism is insufficient without a showing that Process Four should have been applied. "The decisions of the agency are given substantial deference and are presumed correct. The parties seeking mandamus bear the burden of proving otherwise, and the reviewing court must resolve reasonable doubts in favor of the administrative findings and determination." (*Sierra Club, supra*, 121 Cal.App.4th at p. 1497.)

CLL also criticizes the City for not complying with the requirements of the historical resource regulations and the HRG, particularly the absence of any detailed

46

analysis of the project's effect on the Mount Carmel Ranch, the broader historical resource of which the project site's historic farmhouse is a part, or of the project's Area of Potential Effect. Again, CLL's criticism is insufficient. Inadequate explanation regarding compliance is not the same as noncompliance. (See *Sierra Club, supra*, 121 Cal.App.4th at p. 1497.)

CLL's further contention that a recommendation of the Historical Resources Board was required is incorrect; such a recommendation is only required under Process Four. (SDMC, § 126.0504, subd. (b)(2).) And its contention that approval of Cal Coast's project should have been handled under the same procedures as the prior approval of its commercial horse ranch is unpersuasive. The mere fact that CLL complied with different procedures does not show that Cal Coast should be held to those procedures. CLL has not shown the City erred.

VI

*Consistency with the Carmel Valley Neighborhood 8 Precise Plan*

CLL argues that the project conflicts with the Carmel Valley Neighborhood 8 Precise Plan (Precise Plan) adopted by the City. The Precise Plan "provides development guidelines for the Neighborhood 8 portion of Carmel Valley, a designated community plan area within the City[.]" "The Neighborhood 8 Precise Plan also functions as a component in the development implementation process . . . . The precise plan constitutes one of a series of steps in the City approval of development projects in Neighborhood 8. The Carmel Valley Community Plan provides guidelines, proposals and concepts for the future development of the entire Carmel Valley community. The precise plan is used by

47

the individual neighborhoods, within the larger Carmel Valley Plan context, to determine how the specific development unit will take shape. It is the precise plan's role to address issues such as development density, road alignments and community facility sites. The adopted precise plans then become the basis for reviewing subsequent development plans, subdivisions, and other permits within their respective development units." While subordinate to the City's General Plan and the Carmel Valley Community Plan, the Precise Plan guides development in the same way for projects within its area of concern.

The most recent Precise Plan, issued in 2012, designates the project site as open space. In their report to the hearing officer, City staff identified the site as designated natural open space. The report explained, however, that development on the site was consistent with the Precise Plan because the area had already been disturbed: "The project site has been previously disturbed by the prior construction of several concrete pads void of any structures, several accessory buildings, a swimming pool and the historic residential structure. These improvements are or were dispersed throughout the property. The proposed school building is located in an area on the site which was previously developed with a swimming pool which has since been capped and covered with a concrete pad. New drive aisles and parking areas would be located in areas of previous disturbance and are either covered in concrete/asphalt/gravel or are existing unpaved driveways and/or parking areas. The project design limits new development to previously developed and disturbed areas in conformance with the Precise Plan's Open Space policies." In the report to the Planning Commission following CLL's appeal, City

48

staff reiterated their analysis and found no inconsistency between the project and the Precise Plan.

The site development permit issued by the Planning Commission confirms that the project site "is designated Open Space by the Precise Plan."  But it explained, "The proposed Project will be developed on previously disturbed land and will not impact or develop on existing undisturbed open space and [the Multi-Habitat Planning Area] land." It therefore found that the project would not "adversely affect the applicable land use plan."[7]

Any local land use or development decision, including approval of the project at issue here, must be consistent with the applicable general plan and its constituent elements.  (*Orange Citizens for Parks and Recreation v. Superior Court* (2016) 2 Cal.5th 141, 153 (*Orange Citizens*).)  We review the City's finding that the project is consistent with the Precise Plan for abuse of discretion.  (*Id.* at p. 154.)  "A city's determination that a development approval is consistent with its general plan has been described by some courts as 'adjudicatory' [citation] and by others as 'quasi-legislative' [citation].  Where a consistency determination involves the application of a general plan's established land use designation to a particular development, it is fundamentally adjudicatory.  In such

---

7       Curiously, the City and Cal Coast in their joint respondents' brief take the position that the project site is *not* designated open space.  They rely on an earlier 1990 Precise Plan and baldly assert that "any later designation of the site as 'open space' would have been a factual error."  This assertion contradicts the City's position in the approved site development permit and the repeated analyses of City staff.  While we need not explore the consequences of such inconsistency in this appeal, since an alternative ground exists on which to reject CLL's challenge, it is troubling.

49

circumstances, a consistency determination is entitled to deference as an extension of a planning agency's ' "unique competence to interpret [its] policies when applying them in its adjudicatory capacity." ' [Citation.] Reviewing courts must defer to a procedurally proper consistency finding unless no reasonable person could have reached the same conclusion." (*Id.* at pp. 154-155.) "The party challenging a city's determination of general plan consistency has the burden to show why, based on all of the evidence in the record, the determination was unreasonable." (*San Diego Citizenry Group v. County of San Diego* (2013) 219 Cal.App.4th 1, 26.)

CLL focuses on the project's site's multifamily residential (MF-1) zoning and contends that zoning is inconsistent with an open space designation. While "[a] zoning ordinance that conflicts with a general plan is invalid at the time it is passed" (*Lesher Communications, Inc. v. City of Walnut Creek* (1990) 52 Cal.3d 531, 544), the City's zoning decision is not at issue here. The multifamily residential zoning was implemented prior to the latest Precise Plan's open space designation. The Precise Plan contemplated a change in the site's zoning from multifamily residential to open space, but it appears this change has not occurred.

The issue here is whether the *project* is consistent with the Precise Plan's open space designation. CLL does not persuasively address the reasoning behind the City's consistency determination, which was based on previous development at the site. CLL references the general concern for open space, natural vistas, and recreation described in the Precise Plan and similar documents, but it does not explain how the City abused its discretion in finding that the development of the school at issue here would be consistent

50

with the objectives of the open space designation. (CLL's claim that the CVREP trails would be affected by the project's use of the trailhead parking lot has been addressed and rejected above.)

The City could reasonably conclude that the project was consistent with the Precise Plan and its open space designation because the proposed school will be built on already developed land, next to a large commercial horse farm, and will be consistent with the historic nature of the site. (See *Orange Citizens, supra*, 2 Cal.5th at p. 157 [" '[S]tate law does not require perfect conformity between a proposed project and the applicable general plan.' "].) CLL's bare assertion that further evaluation was needed is insufficient.

## VII

### *Site Development Permit Findings*

CLL contends, based on its previous arguments, that the City's findings in the site development permit are not supported by the evidence. We find that contention unpersuasive for the reasons we have already discussed with respect to CLL's specific arguments above.

51

DISPOSITION

The judgment is affirmed.

                                                                             McCONNELL, P. J.

WE CONCUR:



HUFFMAN, J.



AARON, J.

CERIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| CLEWS LAND AND LIVESTOCK, LLC et al.,<br><br>    Plaintiffs and Appellants,<br><br>       v.<br><br>CITY OF SAN DIEGO,<br>    Defendant and Respondent,<br><br>JAN DUNNING et al.,<br>    Real Parties in Interest and<br>    Respondents. | D071145<br><br><br>(Super. Ct. No. 37-2015-00032905-CU-TT-CTL)<br><br>ORDER CERTIFYING OPINION FOR PUBLICATION |

THE COURT:

The opinion filed December 20, 2017 was not certified for publication. It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), the requests pursuant to California Rules of Court, rule 8.1120(a) for publication are GRANTED.

IT IS HEREBY CERTIFIED that the opinion meets the standard for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to Be Published in the Official Reports" appearing on page 1 of said opinion be deleted and the opinion herein be published in the Official Reports.

McCONNELL, P. J.

Copies to: All parties