Filed 4/23/21; Certified for Publication 5/13/21 (order attached)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| JAN DUNNING et al., | D076570 |
| Plaintiffs and Respondents, | |
| v. | (Super. Ct. No. 37-2019-00002241-CU-NP-NC) |
| KEVIN K. JOHNSON, APLC, et al. | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court of San Diego County, Timothy M. Casserly, Judge.  Affirmed in part and reversed in part.

Dunn DeSantis Walt & Kendrick, James A. McFaul, and Bradley A. Lebow, for Defendants and Appellants Kevin K. Johnson, APLC, Jeanne L. Mackinnon, and Kevin K. Johnson.

Polek Law and Frank J. Polek, for Defendant and Appellant Christian Clews.

Higgs Fletcher & Mack, John Morris, Rachel E. Moffitt, and Steven Brunolli, for Defendants and Appellants Barbara Clews and Clews Land & Livestock.

Aannestad Andelin & Corn, Jonathan C. Corn, Anders T. Aannestad, Lee M. Andelin, and Arie L. Spangler, for Plaintiffs and Respondents.

# I

# INTRODUCTION

Kevin K. Johnson, APLC, Kevin Johnson, and Jeanne MacKinnon (collectively, the attorney defendants) filed a petition for writ of mandate and complaint on behalf of their clients Christian Clews (Christian), Barbara Clews (Barbara), and Clews Land & Livestock, LLC (CLL) (collectively, Clews Horse Ranch) challenging a decision of the City of San Diego (City) to approve the construction of a private secondary school adjacent to the Clews's commercial horse ranch. The petition asserted the City's approval of the project and adoption of a mitigated negative declaration for the project violated the California Environmental Quality Act (CEQA, Pub. Resources Code, § 21000 et seq.),[1] the San Diego Municipal Code (Municipal Code), and the City's land use plan. The trial court denied relief and, in *Clews Land and Livestock, LLC v. City of San Diego* (2017) 19 Cal.App.5th 161 (*Clews*), we affirmed the judgment. Hereafter, we will refer to the mandate proceeding and related appeal as the CEQA Litigation.

Jan Dunning, Cal Coast Academy RE Holdings, LLC, and North County Center for Educational Development, Inc. (collectively, Cal Coast)— the developers of the project and real parties in interest in the CEQA Litigation—then filed this lawsuit against Clews Horse Ranch and the attorney defendants for malicious prosecution. Cal Coast asserted the

---

[1] Subsequent undesignated statutory references are to the Public Resources Code.

defendants lacked probable cause and acted with malice when they pursued the CEQA Litigation.

The attorney defendants filed a special motion to strike Cal Coast's complaint under section 425.16 of the Code of Civil Procedure, commonly known as the anti-SLAPP statute. Clews Horse Ranch filed a notice of joinder to the attorney defendants' anti-SLAPP motion. The trial court denied the motion after finding that Cal Coast established a probability of prevailing on its malicious prosecution claim. Clews Horse Ranch and the attorney defendants appeal the order denying the anti-SLAPP motion.

We conclude Cal Coast established a probability of prevailing on its malicious prosecution claim against Clews Horse Ranch, but not against the attorney defendants. Therefore, we affirm the order denying the anti-SLAPP motion as to Clews Horse Ranch and reverse the order denying the anti-SLAPP motion as to the attorney defendants.

II

BACKGROUND

The facts set forth in Sections II.A, II.B, and II.C are drawn largely from this court's opinion in *Clews, supra*, 19 Cal.App.5th 161.

A

*The Project*

In 2013, Cal Coast purchased land in Carmel Valley with the intent to construct and operate a private secondary school on the property. The property sat on a bluff above State Route 56, a busy divided highway, and was adjacent to an equestrian facility owned and operated by Clews Horse Ranch. The property was situated at the end of Clews Ranch Road, a private driveway that also provided access to the ranch. Clews Ranch Road

3

connected with Carmel Country Road. At that intersection, a public parking lot served recreational bicycle and hiking trails in the area.

Cal Coast planned to construct a 5,340-square-foot school, divided into three classroom buildings under a single roof. The school would have approximately 18 staff members and a maximum enrollment of 75 students. The parking lot at the intersection of Clews Ranch Road and Carmel Country Road would serve as a pick-up and drop-off point for students. Cal Coast would use shuttle vans to transport students between the parking lot and the school to reduce traffic and noise on Clews Ranch Road.

B

*The Approval Process*

Cal Coast applied to the City for the approvals necessary for the project. The City prepared an initial study in which its staff determined the project would not have a significant impact on any environmental factors with the exception of cultural resources. City staff concluded the impact on cultural resources would be less than significant if mitigation measures were adopted. They also determined a farmhouse on the project site was a historical resource, but the project's effect on the farmhouse would be less than significant. Further, they determined the project was compatible with the community plan, would not expose people or structures to a significant risk of loss, injury, or death involving wildland fires, and would have no environmental impact on noise, recreational resources, or traffic and transportation.

Based on the initial study, City staff prepared a draft mitigated negative declaration (MND) for the project.[2]  The draft MND described the project, identified the potential impact on cultural resources, and discussed the mitigation measures required to lessen any such impact.

Interested parties submitted comments to the draft MND.  Johnson submitted a comment on behalf of Clews Horse Ranch challenging the use of an MND and asserting an environmental impact report (EIR) was necessary to assess the project's potential impacts on historical resources, fire hazards, noise, and transportation and traffic.  As relevant here, the comment posited that potential noise from the school, such as buzzers and bells, may "spook horses, distract riders and seriously annoy professional trainers" at the ranch.  A rider associated with Clews Horse Ranch also submitted a comment opposing the project and noting that "[o]n at least three occasions riders [had been] thrown from terrified horses due to loud, unanticipated noise[s], or blowing plastic sheets that were improperly tied down."

Cal Coast commissioned consultants to prepare analyses regarding noise and other topics discussed in the comments to the draft MND.  The noise consultant reported the school would be in session from 8:30 a.m. until

_____

[2]    An MND is a negative declaration, or written statement, that is " 'prepared for a project when the initial study has identified potentially significant effects on the environment, but (1) revisions in the project plans or proposals made by, or agreed to by, the applicant before the proposed negative declaration and initial study are released for public review would avoid the effects or mitigate the effects to a point where clearly no significant effect on the environment would occur, and (2) there is no substantial evidence in light of the whole record before the public agency that the project, as revised, may have a significant effect on the environment.' " (*Citizens for a Megaplex-Free Alameda v. City of Alameda* (2007) 149 Cal.App.4th 91, 97, fn. 3.)  An agency's adoption of a final MND ends CEQA review. (*Protecting Our Water and Environmental Resources v. County of Stanislaus* (2020) 10 Cal.5th 479, 489 (*POWER*).)

2:00 p.m., with morning and lunch breaks. No physical education classes would be on site and the school would not use bells or other alarms (except for fire alarms). Given the proximity of State Route 56, approximately 200 feet from the project site, the consultant found the average ambient noise level at the project site was approximately 60 decibels. The consultant identified the loudest likely noise generated by students and faculty at the school would be laughter, which has a noise level of approximately 88 decibels. It modeled a worst-case scenario, where the laughter would be continuous over a one-hour period, and measured the noise that would be heard at receiver locations in the habitat area adjacent to the project site. The weighted average noise levels ranged between 38 and 49 decibels at the receivers in the model. Because these levels were less than 60 decibels and less than ambient noise levels, the consultant concluded the project's noise impact would not exceed levels that would disturb sensitive wildlife under the City's noise significance determination thresholds.[3]

City staff then responded to the comments regarding the draft MND. In the response to Clews Horse Ranch's comment, City staff stated an EIR was not appropriate because all significant environmental risks would be avoided or mitigated due to project design features and revisions to the project. Regarding the issue of noise, City staff referenced the noise consultant's study and its conclusion that "the noise levels generated by the proposed school would not exceed 60 [decibels] at the adjacent habitat and

---

[3]     " ' "A threshold of significance is an identifiable quantitative, qualitative or performance level of a particular environmental effect, non-compliance with which means the effect will normally be determined to be significant by the agency and compliance with which means the effect normally will be determined to be less than significant." ' " (*Golden Door Properties, LLC v. County of San Diego* (2020) 50 Cal.App.5th 467, 493 (*Golden Door*).)

6

would also be less than existing ambient noise levels." City staff prepared and adopted a final MND for the project.

Thereafter, the Carmel Valley Community Planning Board (the Board) considered the project. The Board is an advisory group that makes recommendations to decisionmakers regarding development projects. Several Board members expressed concern about the zoning of the project site and expressed their desire to have open space there. The project was put to a vote and failed, with five in favor, four opposed, and two abstentions. Nine votes were required to support the project.

A City hearing officer then considered the project at a public hearing during which attendees spoke in favor of and against the project. Christian spoke in opposition to the project and stated the project would "condemn" his horse ranch, which had "lost three [boarded] horses just because of the threat of the school …." Regarding the issue of noise, Christian stated the school's fire alarms might produce noise if they needed to be tested or if they malfunctioned. A speaker who boarded a horse at the ranch also spoke in opposition to the project, stating he would not ride his horse on a trail located to the north of the project site out of concern that the school would be noisy. Notwithstanding these and other stated concerns, the hearing officer approved the project and adopted the MND.

At the time, the Municipal Code provided that a hearing officer's decision may be appealed to the City's Planning Commission within 10 business days (Mun. Code, § 112.0506, subd. (b)), but any appeal from an environmental determination—including adoption of an MND—must simultaneously be made to the City Council within the same period (*id.*, §§ 112.0520, subds. (a)–(b), (e), 113.0103.) The attorney defendants, on behalf of Clews Horse Ranch, appealed the hearing officer's decision to the

7

Planning Commission, which denied the appeal and granted a coastal development permit and site development permit for the project. The attorney defendants did not timely appeal the adoption of the MND to the City Council on behalf of Clews Horse Ranch.

Clews Horse Ranch then purported to appeal the Planning Commission's decision to the City Council and indicated it was appealing both the project approval and the adoption of the MND. The City rejected Clews Horse Ranch's appeal. It stated the Planning Commission's decision was final as to the permit approvals and the attempted appeal from the adoption of the MND was untimely.

C

*The CEQA Litigation*

Represented by the attorney defendants, Clews Horse Ranch filed a petition for writ of mandate to compel the City to set aside its approval of the project and adoption of the final MND, as well as a complaint for declaratory and injunctive relief, violation of procedural due process, and equitable estoppel.[4] The petition asserted the project may have significant environmental impacts in the areas previously discussed and the City violated CEQA by failing to require an EIR for the project. Further, it claimed the City violated CEQA by including significant new information in the final MND that was not circulated for public comment. Finally, it alleged the project violated applicable land use plans and the City's historical resources regulations.

---

[4] Separately, Clews Horse Ranch appealed the Planning Commission's issuance of a coastal development permit to the California Coastal Commission. The California Coastal Commission found the appeal did not raise a substantial issue.

8

The petition asserted the City was estopped from arguing that Clews Horse Ranch failed to exhaust its administrative remedies by not timely appealing the adoption of the MND. It argued the City was estopped because, in Clews Horse Ranch's view, the notice for the hearing officer proceedings and a City-issued bulletin misleadingly suggested that environmental determinations did not need to be appealed until after the completion of proceedings before the Planning Commission. Additionally, Clews Horse Ranch asserted the City's appeals process was invalid because it did not comply with CEQA.

After briefing and argument, the trial court denied the petition and denied recovery for Clews Horse Ranch. The court rejected Clews Horse Ranch's estoppel argument and found its CEQA claims were barred due to its failure to exhaust administrative remedies. The court did not expressly address the argument that the City's administrative appeals process violated CEQA.

As an alternative basis for denying the writ petition, the court found "the MND was the appropriate environmental document for the modest project in question, and there was no violation of CEQA." The court stated it searched "for substantial evidence in the record that would support a 'fair argument' that significant impacts or effects may occur and will not be mitigated," but it "found none." It opined that "much of what motivated [Clews Horse Ranch's] objection to the building of the school next door ha[d] nothing [to] do with environmental concerns. [Clews Horse Ranch] just [did] not want the academy as a neighbor because [it felt] it [would] affect [it] adversely from an economic perspective."

Clews Horse Ranch appealed and we affirmed the judgment. (*Clews, supra*, 19 Cal.App.5th 161.) We concluded the challenge to the adoption of

9

the final MND was barred because Clews Horse Ranch did not exhaust its administrative remedies. (*Id.* at pp. 184–188.) In doing so, we rejected the argument that the City's administrative appeals process, as implicated by the project, violated CEQA. (*Id.* at pp. 188–189.) Further, we noted that the estoppel argument raised in the trial court was not pressed on appeal. (*Id.* at pp. 189–191.)

We concluded the challenge to the MND failed on the merits as well. (*Clews, supra*, 19 Cal.App.5th at pp. 191–202.) We determined the project was consistent with applicable land use plans, the City adhered to its historical resources regulations, and Clews Horse Ranch failed to show there was substantial evidence supporting a fair argument that the project may have a significant effect on the environment in the areas of fire hazards, traffic and transportation, noise, recreation, or historical resources. (*Ibid.*)

Regarding the issue of noise, in particular, we noted that individuals associated with Clews Horse Ranch "predicted significant noise impacts because noises from school activities could disrupt ranch operations." (*Clews, supra*, 19 Cal.App.5th at p. 196.) However, we concluded "the possibility that noise [would] impact the horse ranch's operations [was] insufficient" to warrant an EIR because " '[u]nder CEQA, the question is whether a project will affect the environment of persons in general, not whether a project will affect particular persons.' " (*Ibid.*) Further, we explained that "[t]he noise likely generated by the school (children laughing and playing, cars driving, doors closing, etc.) [would be] insignificant in the context of the environment as a whole, especially given the project's location near a busy highway, State Route 56, and [Clews Horse Ranch's] large ranch." (*Ibid.*)

Clews Horse Ranch filed a petition for rehearing, which we denied.

## D

### *The Malicious Prosecution Action and Anti-SLAPP Motion*

Subsequently, Cal Coast filed a malicious prosecution action against the attorney defendants, Clews Horse Ranch, and Carmel Creek Ranch, LLC, the alleged successor in interest to CLL. The complaint asserted the CEQA Litigation terminated in Cal Coast's favor and the defendants pursued the CEQA Litigation without probable cause and with malice.

The complaint alleged three theories as to why the defendants acted with malice. First, it alleged Clews Horse Ranch pursued the CEQA Litigation to prevent or delay development on Cal Coast's property. Second, it stated that Christian pleaded guilty to federal criminal charges of possessing and distributing child pornography. According to the complaint, the defendants pursued the CEQA Litigation "to maintain the seclusion that allowed Christian Clews to continue his grotesque sexual abuse and exploitation of children visiting his ranch." Third, the complaint alleged the attorney defendants pursued the CEQA Litigation because they hoped prolonged litigation would cause Cal Coast to abandon its project, which in turn would reduce the likelihood of Clews Horse Ranch filing a legal malpractice claim or State Bar complaint against them for failing to timely appeal the adoption of the MND.

The attorney defendants filed a special motion to strike the complaint under the anti-SLAPP law. Together with the motion, the attorney defendants filed declarations from defendants Johnson and MacKinnon. The declarants denied they were motivated by a desire to avoid a potential malpractice action or State Bar complaint and averred they did not learn of Christian's criminal conduct until after they appealed the judgment in the

11

CEQA Litigation.  They further averred they believed there were reasonable grounds to pursue the CEQA Litigation.

The attorney defendants filed declarations from two other attorneys as well—Michael Woods and Douglas Carstens.  Woods, an attorney with experience in municipal law, averred that Johnson consulted him before the filing of the CEQA Litigation.  Woods averred he advised Johnson that he believed Clews Horse Ranch "substantially complied" with the City's administrative appeal procedures and he believed there was good cause to challenge the denial of the administrative appeal in court.  Carstens, an attorney with experience in environmental law, averred he believed there was probable cause to challenge the project on the merits.

Clews Horse Ranch filed notices of joinder to the attorney defendants' anti-SLAPP motion and a declaration from Barbara.[5]  In her declaration, Barbara averred she retained the attorney defendants and pursued the CEQA Litigation because she had genuine concerns about the project's environmental and safety impacts.

Cal Coast opposed the anti-SLAPP motion.  Together with the opposition, it filed declarations from plaintiff Dunning and Matthew Peterson, an attorney who represented Cal Coast in the CEQA Litigation. Both declarants averred that Cal Coast agreed to numerous concessions (e.g., using shuttle vans to transport students, locating the school building away from the horse ranch), but Clews Horse Ranch demanded unreasonable concessions (e.g., the construction of a 12-foot wall along the property line, a 40-student enrollment cap, and closure of the school when there was a red flag fire alert anywhere in the county) during settlement negotiations.

---

[5]     There is no indication in the appellate record that defendant Carmel Creek Ranch, LLC filed an anti-SLAPP motion or joined the attorney defendants' anti-SLAPP motion.

12

According to Peterson, these "bad faith" negotiations demonstrated the defendants' "real purpose and motivation" was to block the project or cause Cal Coast to abandon it. Dunning averred as to the details of Christian's criminal arrest and expressed a belief that Christian wanted "to prevent the development of [the] property … to keep his illegal activities private."

Cal Coast also filed declarations from individuals indicating that Clews Horse Ranch interfered with use and development on the project site in the past. Several declarants, including a former owner of the property and his building contractors, averred that Clews Horse Ranch opposed the former owner's plan to renovate the property's farmhouse, restricted the former owner's use of Clews Ranch Road, and falsely reported to the City that there were code violations on the property. Another declarant, an attorney who represented a former owner of the property, Chabad Jewish Center of Del Mar (Chabad), averred that Christian installed and locked a gate to prevent Chabad's members from accessing the property, shone vehicle lights into the Chabad facility and played loud music during religious services, harassed and berated people as they walked to the Chabad facility, had Chabad's water shut off, got into a physical altercation with a Chabad rabbi, and exhibited an "unwavering intention to have [Chabad] removed from the facility."

The attorney defendants filed a reply brief in support of their anti-SLAPP motion. Barbara and CLL (but not Christian) filed a notice of joinder to the attorney defendants' reply brief.

After a hearing, the trial court denied the anti-SLAPP motion. It found Cal Coast's malicious prosecution claim arose from protected activity falling within the scope of the anti-SLAPP statute. However, it denied the motion after finding that Cal Coast demonstrated a probability of prevailing on its

13

claim against all of the defendants.  The court found there was at least minimal merit to Cal Coast's argument that the defendants filed or maintained the CEQA Litigation without probable cause.  In particular, the court noted the defendants "blew the time to appeal during the administrative process" and, in *Clews, supra*, 19 Cal.App.5th 161, our court found there was not a fair argument that the project required an EIR.  The court also found there was at least minimal merit that the defendants pursued the CEQA Litigation with malice to deprive Cal Coast of the beneficial use of its property.

The defendants appeal the order denying the anti-SLAPP motion.[6]

### III

### DISCUSSION

### A

### *CEQA*

"CEQA was enacted to (1) inform the government and public about a proposed activity's potential environmental impacts; (2) identify ways to reduce, or avoid, those impacts; (3) require project changes through alternatives or mitigation measures when feasible; and (4) disclose the government's rationale for approving a project.  [Citation.]  CEQA embodies a central state policy requiring 'state and local governmental entities to perform their duties "so that major consideration is given to preventing environmental damage." ' [Citation.]  Accordingly, CEQA prescribes how governmental decisions will be made whenever an agency undertakes, approves, or funds a project." (*POWER, supra*, 10 Cal.5th at p. 488.)

---

[6]    The attorney defendants filed appellate briefs challenging the anti-SLAPP order.  Clews Horse Ranch joined the arguments presented in the attorney defendants' briefs.  (Cal. Rules of Court, rule 8.200(a)(5).)

14

If an activity constitutes a project and is not exempt, the "agency must conduct an environmental review. [Citation.] A required environmental review proceeds in stages. The agency conducts an initial study to assess potential environmental impacts." (*POWER, supra*, 10 Cal.5th at p. 488.)

If the agency's initial study discloses "no substantial evidence that the project may significantly affect the environment, the agency prepares a negative declaration and environmental review ends." (*POWER, supra*, 10 Cal.5th at pp. 488–489; see § 21080, subd. (c)(1).) " 'Negative declaration' means a written statement briefly describing the reasons that a proposed project will not have a significant effect on the environment and does not require the preparation of an environmental impact report." (§ 21064.)

"If potentially significant environmental effects are discovered, but the project applicant agrees to changes that would avoid or mitigate them, the agency prepares a mitigated negative declaration [citations], which also ends CEQA review." (*POWER, supra*, 10 Cal.5th at p. 489; see § 21080, subd. (c)(2).) As previously noted, an MND "means a negative declaration prepared for a project when the initial study has identified potentially significant effects on the environment, but (1) revisions in the project plans or proposals made by, or agreed to by, the applicant before the proposed negative declaration and initial study are released for public review would avoid the effects or mitigate the effects to a point where clearly no significant effect on the environment would occur, and (2) there is no substantial evidence in light of the whole record before the public agency that the project, as revised, may have a significant effect on the environment." (§ 21064.5.)

"[I]f the initial study reveals substantial evidence that the project may have a significant environmental impact and a mitigated negative declaration is inappropriate, the agency must prepare and certify an

15

environmental impact report (EIR) before approving the project." (*POWER, supra,* 10 Cal.5th at p. 489; see § 21080, subd. (d).) " 'The basic purpose of an EIR is to "provide public agencies and the public in general with detailed information about the effect [that] a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project." ' " (*Golden Door, supra,* 50 Cal.App.5th at p. 504; see § 21061.)

When a court reviews an agency's decision to adopt an MND (in lieu of preparing and certifying an EIR), it asks "whether there is substantial evidence in the record to support a 'fair argument' that a proposed project may have a significant effect on the environment. [Citation.] The fair argument standard creates a 'low threshold' for requiring an EIR, reflecting a legislative preference for resolving doubts in favor of environmental review." (*Preserve Poway v. City of Poway* (2016) 245 Cal.App.4th 560, 575–576.) However, " '[m]ere argument, speculation, and unsubstantiated opinion, even expert opinion, is not substantial evidence for a fair argument. [Citations.] ... Neither is the mere possibility of adverse impact on a few people, as opposed to the environment in general.' " (*Taxpayers for Accountable School Bond Spending v. San Diego Unified School Dist.* (2013) 215 Cal.App.4th 1013, 1036; see §§ 21080, subd. (e)(1), 21082.2, subd. (c).)

## B

### *Anti-SLAPP*

#### 1

##### *General Legal Principles*

"Enacted by the Legislature in 1992, the anti-SLAPP statute is designed to protect defendants from meritless lawsuits that might chill the exercise of their rights to speak and petition on matters of public concern.

16

[Citations.] To that end, the statute authorizes a special motion to strike a claim 'arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue.' " (*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 883–884 (*Wilson*).)

A trial "court evaluates an anti-SLAPP motion in two steps. 'Initially, the moving defendant bears the burden of establishing that the challenged allegations or claims "aris[e] from" protected activity in which the defendant has engaged. [Citations.] If the defendant carries its burden, the plaintiff must then demonstrate its claims have at least "minimal merit." ' " (*Wilson, supra*, 7 Cal.5th at p. 884.) In the present case, it is undisputed the plaintiffs' malicious prosecution cause of action arose from protected activity. Therefore, our inquiry is limited strictly to whether Cal Coast satisfied its second step burden—i.e., whether it demonstrated that each element of its malicious prosecution cause of action has at least minimal merit.

The second step of the anti-SLAPP analysis has been described as a summary judgment-like procedure. (*Sweetwater Union High School Dist. v. Gilbane Building Co.* (2019) 6 Cal.5th 931, 940 (*Sweetwater Union*).) The court determines whether " 'the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment.' " (*Ibid.*) To make a prima facie factual showing, the plaintiff " 'may not rely solely on its complaint, even if verified; instead, its proof must be made upon competent admissible evidence.' " (*Ibid.*) The defendant may support its anti-SLAPP motion with evidence, which the court must consider. (*1-800 Contacts, Inc. v. Steinberg* (2003) 107 Cal.App.4th 568, 585.) However, " '[t]he court does not weigh evidence or resolve conflicting factual claims.' " (*Sweetwater Union*, at p. 940.) Rather, the court "accepts the plaintiff's

17

evidence as true, and evaluates the defendant's showing only to determine if it defeats the plaintiff's claim as a matter of law. [Citation.] "[C]laims with the requisite minimal merit may proceed." ' " (*Ibid.*)

Appellate courts review an order denying an anti-SLAPP motion de novo. (*Sweetwater Union, supra*, 6 Cal.5th at p. 940.)

2

*Cal Coast Established a Probability of Prevailing*
*Against Clews Horse Ranch, but Not Against the Attorney Defendants*

As noted, our analysis will focus solely on whether Cal Coast established a probability of prevailing on each element of its malicious prosecution cause of action. To prevail on a malicious prosecution action, the plaintiff must prove three elements. The plaintiff "must show that the prior action (1) was commenced [or maintained] by or at the direction of the defendant and was pursued to a legal termination favorable to the plaintiff; (2) was brought [or maintained] without probable cause; and (3) was initiated [or maintained] with malice." (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 292; see *Gruber v. Gruber* (2020) 48 Cal.App.5th 529, 537.)

i

*Cal Coast Established a Probability of Prevailing*
*on the Lack of Probable Cause Element Against All Defendants*

It is undisputed the CEQA Litigation was initiated or maintained by or at the direction of the defendants and terminated in Cal Coast's favor. However, the parties dispute whether Cal Coast made a prima facie showing that the defendants pursued the CEQA Litigation without probable cause and with malice. We begin with the issue of lack of probable cause.

An action is filed or maintained without probable cause if it is " 'not legally tenable when viewed in an objective manner as of the time the action was initiated or while it was being prosecuted.' " (*Olivares v. Pineda* (2019)

18

40 Cal.App.5th 343, 355.) When malicious prosecution is asserted against an attorney, the objective standard governing the probable determination is "whether, on the basis of facts then known, any reasonable attorney would have believed that instituting or maintaining the prior action was tenable." (*Citizens of Humanity, LLC v. Hass* (2020) 46 Cal.App.5th 589, 599 (*Citizens of Humanity*); see *Cole v. Patricia A Meyer & Associates, APC* (2012) 206 Cal.App.4th 1095, 1106 [the "objective standard of review is similar to the standard for determining whether a lawsuit is frivolous: whether 'any reasonable attorney would have thought the claim tenable' "].)

" 'In analyzing the issue of probable cause in a malicious prosecution context, the trial court must consider both the factual circumstances established by the evidence and the legal theory upon which relief [was] sought' " in the prior action. (*Jay v. Mahaffey* (2013) 218 Cal.App.4th 1522, 1540 (*Jay*).) " ' "[P]robable cause is lacking 'when a prospective plaintiff and counsel do not have evidence sufficient to uphold a favorable judgment or information affording an inference that such evidence can be obtained for trial.' " ' [Citations.] ' "In a situation of complete absence of supporting evidence, it cannot be adjudged reasonable to prosecute a claim." ' [Citation.] 'When there is a dispute as to the state of the defendant's knowledge and the existence of probable cause turns on resolution of that dispute ... the jury must resolve the threshold question of the defendant's factual knowledge or belief.' " (*Daniels v. Robbins* (2010) 182 Cal.App.4th 204, 222–223 (*Daniels*).)

"In the context of a malicious prosecution action, 'When a complaint alleges multiple theories of liability or "counts," the counts "are merely ways of stating the same cause of action differently." [Citation.] Accordingly, the only way that a litigant can show probable cause for the cause of action as a whole—or for the "primary right"—is to show probable cause for *each* of the

19

counts or theories alleged.' [Citation.] Thus, even when the prior lawsuit involves multiple causes of action, the subsequent malicious prosecution action seeks 'to vindicate a single primary right—the right to be free from defending against a lawsuit initiated with malice and without probable cause.' [¶] For anti-SLAPP purposes, a plaintiff who ' "can show a probability of prevailing on *any part of its claim*" ' does not have a meritless claim and a motion to strike is not proper—' "the entire cause of action stands." ' " (*Cuevas-Martinez v. Sun Salt Sand, Inc.* (2019) 35 Cal.App.5th 1109, 1118– 1119; see *Roche v. Hyde* (2020) 51 Cal.App.5th 757, 822 ["By showing prima facie that any one of … [defendant's] multiple bases for suing was without probable cause, [plaintiff] has met his anti-SLAPP step two burden."].)

Applying these standards, we conclude Cal Coast established, with at least minimal merit, that the defendants did not have probable cause for pursuing at least one of their CEQA theories—namely, their claim that an EIR was necessary to assess the project's noise impact. As noted, there was evidence in the administrative record—in the form of testimony and comments from Christian and others associated with Clews Horse Ranch— that noise from the school would annoy riders or frighten horses at the ranch, or while they rode to and from the ranch on Clews Ranch Road. However, that evidence concerned the project's expected impact on Clews Horse Ranch and its patrons—not the environment. Indeed, much of the evidence in the record concerned the fiscal and operational problems Clews Horse Ranch would experience if the project caused riders to stop leasing or board horses at the ranch. These impacts are not covered by CEQA and it would be untenable to suggest otherwise. (*Banker's Hill, Hillcrest, Park West Community Preservation Group v. City of San Diego* (2006) 139 Cal.App.4th 249, 279 [" 'Under CEQA, the question is whether a project will affect the

20

environment of persons in general, not whether a project will affect particular persons.' "]; *Maintain Our Desert Environment v. Town of Apple Valley* (2004) 124 Cal.App.4th 430, 446 ["[S]ocial, economic and business competition concerns are not relevant to CEQA analysis unless it is demonstrated that those concerns will have a significant effect on the physical environment."].)

The defendants contend they had probable cause to challenge the City's adoption of an MND based on the project's anticipated noise impacts because there was at least some evidence in the administrative record concerning the impact of noise on the "surrounding environment." They emphasize that one opponent of the project—a person who leased and boarded horses at Clews Horse Ranch—stated during the administrative appeals hearings that noise from the school would cause some horse riders such as himself to avoid using a trail located on the north side of the project site.

Even if we were to agree that the speaker's statements concerned the project's impact on the "surrounding environment"—as opposed to Clews Horse Ranch—we would nonetheless conclude Cal Coast demonstrated a probability of prevailing on the element of lack of probable cause. The speaker who discussed horse riders' use of the northside trail opined only generally that the project likely would cause noise because "kids are kids," "[t]hey move fast," and "[t]hey are loud." With similar vagueness, he added, "if you put a school there, you're going to have the negative impact of a lot of chaos … that's both going to hurt the horse path," and "it's really going to have a big effect on that portion of the horse path."

We are mindful that "[r]elevant personal observations of area residents on nontechnical subjects may qualify as substantial evidence for a fair argument." (*Pocket Protectors v. City of Sacramento* (2004) 124 Cal.App.4th 903, 928.) However, " '[i]n the absence of a specific factual foundation in the

21

record, dire predictions by nonexperts regarding the consequences of a project do not constitute substantial evidence.' " (*Joshua Tree Downtown Business Alliance v. County of San Bernardino* (2016) 1 Cal.App.5th 677, 691 (*Joshua Tree*).) Further, "mere argument, speculation, and unsubstantiated opinion, even expert opinion, is not substantial evidence for a fair argument." (*Pocket Protectors*, at p. 928.) Here, the speaker who discussed the project's anticipated impacts on nearby trails gave precisely the type of speculative and generalized warnings that do not constitute substantial evidence.

Further, we note the defendants did not conduct or commission—and therefore did not purport to base their noise-related CEQA arguments on—a noise study or analysis. By contrast, Cal Coast *did* commission such a noise study. That study modeled a worst-case scenario and found the noise impacts from the project would be less than 60 decibels and less than the existing ambient noise level at the project site, which was located a mere 200 feet from a busy divided highway. It also found the noise from the project would not disturb wildlife under the City's noise significance determination thresholds.

The defendants point to supposed deficiencies in the noise study, noting it did not analyze noise impacts from construction or planned outdoor school events. We are not persuaded these alleged deficiencies gave rise to a fair argument of a significant noise impact. When an agency decides an EIR is unnecessary, it is " 'the [challenger's] burden to demonstrate … the existence of substantial evidence supporting a fair argument of significant environmental impact. [Citation.]' … ' " 'The lack of study is hardly evidence that there *will be* a significant impact.' " ' " (*Joshua Tree, supra*, 1 Cal.App.5th at p. 677; accord *Rominger v. County of Colusa* (2014) 229 Cal.App.4th 690, 729 [an EIR was unnecessary to assess a project's impact on

22

groundwater supplies because "beyond complaining about supposed deficiencies in the [county's] water supply assessment, the [plaintiffs] ma[de] no effort to demonstrate that the record contain[ed] substantial evidence supporting a fair argument that the [project] may have a significant impact on groundwater supplies"], disapproved on another ground in *Union of Medical Marijuana Patients, Inc. v. City of San Diego* (2019) 7 Cal.5th 1171, 1194, fn. 10.) Thus, the alleged deficiencies in Cal Coast's noise study do not suggest that the defendants had a tenable argument under CEQA.

For all the foregoing reasons, we conclude Cal Coast made the showing necessary to establish that the defendants pursued their noise-related CEQA arguments without sufficient evidence to support a favorable judgment—i.e., without probable cause. We emphasize that this is not a decision on the merits of Cal Coast's malicious prosecution claim. It is not a determination that the defendants lacked probable cause to assert that an EIR was needed to assess the project's noise impacts. Rather, it merely concludes that for purposes of the second step anti-SLAPP analysis, Cal Coast established a probability of prevailing on the issue of whether the defendants pursued at least one of their theories in the CEQA Litigation without probable cause.[7]

---

[7] Because Cal Coast established minimal merit to its assertion that the defendants' noise-related theories lacked probable cause, we need not consider the parties' lack-of-probable-cause arguments concerning the exhaustion of administrative remedies, zoning, the City's compliance with historical resources regulations, and the project's fire hazard, traffic and transportation, recreation, historical resources, and recreation impacts.

23

*Cal Coast Established a Probability of Prevailing on the Malice Element Against Clews Horse Ranch, but Not Against the Attorney Defendants*

Next, we consider whether Cal Coast established a probability of prevailing on the malice element of its malicious prosecution claim.

"The malice element of the malicious prosecution tort goes to the defendant's subjective intent in initiating the prior action. [Citations.] It is not limited to actual hostility or ill will toward the plaintiff. Rather, malice is present when proceedings are instituted primarily for an improper purpose. Suits with the hallmark of an improper purpose are those in which: ' "... (1) the person initiating them does not believe that his claim may be held valid; (2) the proceedings are begun primarily because of hostility or ill will; (3) the proceedings are initiated solely for the purpose of depriving the person against whom they are initiated of a beneficial use of his property; (4) the proceedings are initiated for the purpose of forcing a settlement which has no relation to the merits of the claim." ' " (*Sierra Club Foundation v. Graham* (1999) 72 Cal.App.4th 1135, 1157 (*Sierra Club*).)

" 'Because direct evidence of malice is rarely available, "malice is usually proven by circumstantial evidence and inferences drawn from the evidence." ' " (*Citizens of Humanity, supra*, 46 Cal.App.5th at p. 607.) "The lack of probable cause is one factor in determining the presence of malice, but alone it is insufficient. [Citation.] 'Merely because the prior action lacked legal tenability, as measured objectively (i.e., by the standard of whether any reasonable attorney would have thought the claim tenable [citation]), *without more*, would not logically or reasonably permit the inference that such lack of probable cause was accompanied by the actor's subjective malicious state of

mind. In other words, the presence of malice must be established by other, additional evidence.' " (*Jay, supra*, 218 Cal.App.4th at p. 1543.)

In the record before us, there clearly is sufficient evidence from which it can be found that Clews Horse Ranch pursued the CEQA Litigation with malice. As discussed, there is at least minimal merit to Cal Coast's claim that Clews Horse Ranch filed or maintained one or more of its legal theories without probable cause. Further, several of Cal Coast's declarations suggest that Clews Horse Ranch has consistently and aggressively opposed any use and development of the project site. Those declarations indicate Clews Horse Ranch harassed prior owners of the property on which the project site is located, restricted the prior owners' access to the property, and deployed other hostile and spiteful behaviors to dissuade the property owners from using or developing their land. This evidence and the reasonable inferences arising therefrom constitute a prima facie showing that Clews Horse Ranch harbored similar improper motives when pursuing the CEQA Litigation.

However, Cal Coast did not make a prima facia showing of malice on the part of the attorney defendants. Cal Coast claims the attorney defendants acted with malice because their client, Clews Horse Ranch, had improper motives. It also asserts the CEQA claims were so lacking in probable cause—or frivolous, as Cal Coast puts it—that we must infer the attorney defendants harbored malice. However, it would be improper for us to simply impute the motives of a client to its attorney, as Cal Coast suggests. (*Daniels, supra*, 182 Cal.App.4th at p. 225.) Further, while a lack of probable cause is relevant to the issue of malice, it is insufficient, standing alone, to support a finding of malice. (*Ibid.* ["a lack of probable cause in the underlying action, by itself, is insufficient to show malice"]; see *Antounian v. Louis Vuitton Malletier* (2010) 189 Cal.App.4th 438, 455 ["Even if the

25

[plaintiffs] had shown that the lawsuit was not tenable (that is, filed and prosecuted without probable cause), more would have been required for a showing that the lawsuit was initiated and prosecuted with malice."].) The alleged lack of probable cause and Clews Horse Ranch's asserted motives do not constitute a prima facie showing of malice for the attorney defendants.

Cal Coast asserts the attorney defendants acted with malice because it can be inferred they became aware of their client's improper motives and the lack of probable cause at some point during the CEQA Litigation. (*Lee v. Kim* (2019) 41 Cal.App.5th 705, 727–728 [" '[M]alice can be inferred when a party *continues* to prosecute an action after becoming aware that the action lacks probable cause.' "].) It emphasizes that the trial court in the CEQA Litigation expressed skepticism regarding Clews Horse Ranch's motives and the merits of its claims—skepticism that supposedly should have tipped off the attorney defendants about these issues.[8] However, the court's remarks suggest only that it entertained suspicions about these issues. They do not demonstrate the attorney defendants had explicit or affirmative *awareness* that their clients had inappropriate motives or that their claims were untenable. It would be unreasonable to infer from the court's mere expression of skepticism

_____

[8]     In particular, Cal Coast relies on a colloquy in the mandate proceeding during which defendant Johnson stated, "We've got experts' letters, tremendous investment putting together the evidence that we felt we were going to need to force an EIR." In response, the trial court stated, "That's the key phrase right there, 'force an EIR.' "

that the attorney defendants knew of their clients' motives or knowingly pursued the CEQA Litigation without probable cause.[9]

Cal Coast also asserts the attorney defendants' malice can be inferred from the parties' settlement negotiations. According to Cal Coast, the negotiations show the attorney defendants pursued the CEQA Litigation to settle on terms unrelated to the merits of the case. However, the settlement communications contained in the record do not give rise to such an inference. On the contrary, they show that the parties' attorneys discussed measures to try to resolve the defendants' expressed concerns regarding the project's impacts on fire safety, traffic and transportation, and noise—matters that were at the heart of the CEQA Litigation. Given that the content of the settlement communications addressed the very same topics at issue in the CEQA Litigation, we conclude the settlement communications do not give rise to a reasonable inference that the attorney defendants filed the CEQA Litigation to " ' "forc[e] a settlement *which has no relation to the merits of the claim*." ' " (*Sierra Club, supra*, 72 Cal.App.4th at 1157, italics added.)

Next, Cal Coast asserts it made a prima facie showing that the attorney defendants acted with malice because one of Cal Coast's attorneys submitted a declaration in support of the anti-SLAPP motion, in which he averred as follows: "I believe that the [defendants] were negotiating in bad faith and that their real purpose and motivation was not to address actual environmental impacts, but instead to block the proposed project entirely or delay it long enough that Cal Coast … would either run out of funds, [sic] its

---

9    Similarly, we reject Cal Coast's argument that it can be inferred the attorney defendants knew or became aware of the lack of probable cause based on the California Coastal Commission's finding that Clews Horse Ranch did not present a substantial issue in its appeal of the City's permit decisions for the project. The City's permit approvals and the appeals therefrom were not a part of the CEQA Litigation.

patience, and/or abandon the project." This conclusory statement by Cal Coast's own legal counsel is nothing more than speculation regarding the attorney defendants' motives. It is plainly insufficient to support a finding of malice. (See *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 864 ["Speculation … is not evidence."]; accord *Kerr v. Rose* (1990) 216 Cal.App.3d 1551, 1564 ["it is well established that a plaintiff's 'suspicions of improper motives ... primarily based on conjecture and speculation' are not sufficient to raise a triable issue of fact to withstand summary judgment."].)

Finally, Cal Coast asserts the attorney defendants acted with malice because they "may have been motivated to wear [Cal Coast] down and avoid a decision on the merits," which would in turn reduce the likelihood that Clews Horse Ranch would file a legal malpractice or State Bar complaint against them for failing to exhaust administrative remedies. Cal Coast does not support its argument with citation to the appellate record and, on our own examination of the record, it does not appear Cal Coast filed evidence supporting this contention. Given the absence of competent evidence to support Cal Coast's argument, we conclude Cal Coast's conjecture regarding malpractice-avoidance does not constitute a prima facie showing of malice.

In sum, the appellate record contains evidence from which it can be inferred there was "an apparent lack of evidentiary support" for one or more theories asserted in the CEQA Litigation, "a lack of factual investigation" by the attorney defendants, and "a client [Clews Horse Ranch] who may have had actual ill will" against Cal Coast. (*Daniels, supra*, 182 Cal.App.4th at p. 227.) But it lacks evidence from which it can be inferred that the attorney defendants knowingly pursued untenable claims or otherwise acted with malice. The record is therefore "insufficient as a matter of law to establish malice" as to the attorney defendants. (*Ibid.*)

IV

DISPOSITION

The order denying the anti-SLAPP motion is affirmed as to defendants Christian Clews, Barbara Clews, and Clews Land & Livestock, LLC. Plaintiffs Jan Dunning, Cal Coast Academy RE Holdings, LLC, and North County Center for Educational Development, Inc. are entitled to their appellate costs from defendants Christian Clews, Barbara Clews, and Clews Land & Livestock, LLC. (Cal. Rules of Court, rule 8.278(a)(3).)

The order denying the anti-SLAPP motion is reversed as to defendants Kevin K. Johnson, APLC, Kevin Johnson, and Jeanne MacKinnon. Defendants Kevin K. Johnson, APLC, Kevin Johnson, and Jeanne MacKinnon are entitled to their appellate costs from plaintiffs Jan Dunning, Cal Coast Academy RE Holdings, LLC, and North County Center for Educational Development, Inc. (Cal. Rules of Court, rule 8.278(a)(3).) As prevailing defendants in an anti-SLAPP appeal, defendants Kevin K. Johnson, APLC, Kevin Johnson, and Jeanne MacKinnon are also entitled to their attorney fees. (*RGC Gaslamp, LLC v. Ehmcke Sheet Metal Co.* (2020) 56 Cal.App.5th 413, 438.)

McCONNELL, P. J.

WE CONCUR:

HUFFMAN, J.

DO, J.

29

Filed 5/13/21

| | |
|---|---|
| JAN DUNNING et al., | D076570 |
| Plaintiffs and Respondents, | |
| v. | (Super. Ct. No. 37-2019-00002241-CU-NP-NC) |
| KEVIN K. JOHNSON, APLC et al. | ORDER CERTIFYING OPINION FOR PUBLICATION |
| Defendants and Appellants. | |

THE COURT:

The opinion in this case filed April 23, 2021 was not certified for publication. It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), the request pursuant to rule 8.1120(a) for publication is GRANTED.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to Be Published in the Official Reports" appearing on page one of said opinion be deleted and the opinion herein be published in the Official Reports.

McCONNELL, P. J.

Copies to: All parties